**SONOCO PRODUCTS COMPANY,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD,** Respondent.

No. 21939.

United States Court of Appeals
Ninth Circuit.

Aug. 7, 1968.

E. Judge Elderkin (argued), William R. Irwin, of Brobeck, Phleger & Harrison, San Francisco, Cal., for appellant.

Gary Green (argued), Atty., N.L.R.B., Joseph A. Yablonski, Roy O. Hoffman, Director, N.L.R.B., Gladstein, Anderson, Leonard & Sibbett, Neyhart & Grodin, San Francisco, Cal., Arnold Ordman, Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Washington, D. C., for appellee.

Before BARNES and JERTBERG, Circuit Judges, and CROCKER,* District Judge.

BARNES, Circuit Judge:

The Sonoco Products Company has petitioned this court for review of an order issued on June 19, 1967, by the National Labor Relations Board, and the Board has cross-petitioned for enforcement. The Board's decision and order are reported at 165 N.L.R.B. No. 68.

The issues before us relate to two Board representation elections conducted at petitioner Sonoco's Hayward, California, plant. The first, in which the employees in the unit voted 17–13 against union representation,[1] was set aside by the Board's Regional Director. The Regional Director declined, however, to set aside the second election—in which the employees approved the union in question by a 16–14 margin—despite Sonoco's contentions that union conduct interfered with the free choice of certain employees.[2] Petitioner thereupon refused to bargain with the union and was found by the Board thereby to have violated

---

* Hon. M. D. Crocker, United States District Judge, Eastern District, Fresno, California.

1. We will use the term "union" to refer comprehensively to the two unions which were involved in the elections and which were ultimately certified as a joint representative of the employees in question: the Brotherhood of Teamsters and Auto Truck Drivers, Local 70, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, and the Warehouse, Processing and Allied Workers Local No. 6, International Longshoremen's and Warehousemen's Union.

2. Sonoco's requests that the Board review the Regional Director's rulings were denied in the exercise of the Board's discretion.

sections 8(a) (1) and (5) of the National Labor Relations Act, 29 U.S.C. § 158(a) (1), (5) (1964). Issuance of the usual bargaining order followed, and it is that order which is challenged here.

Sonoco asserts that the order should be set aside on two grounds. First, it contends that the Regional Director erred in invalidating the first election. And second, it claims that it was denied the right to a hearing with respect to its challenges to the second election. We reject the first contention but find merit in the second. Accordingly, we deny enforcement of the Board's order, set the order aside, and remand to the Board for further proceedings.

## I. THE FIRST ELECTION

The Regional Director invalidated the first election on the ground that a speech made to employees by petitioner's Plant Manager Murry Hughes on the day preceding the election interfered with the "laboratory conditions" the Board requires in order to assure a fair and free election. The part of Hughes' speech which was deemed objectionable included the following remarks:

"If this union organizational activity had not been started, you would now be enjoying even higher base rates and other fringe benefits. The Company was not able to grant these improvements, however, because of the union organizational drive. Those of you who have worked here for several years are surely aware of the fact that wages and fringe benefits have been increased every year without interruption since beginning the operation in Fremont in 1959. At the time of our increases in wages and fringe benefits last year, we had been losing large amounts of money and an increase at that time was really not justifiable, but an increase of 5¢ to 8¢ was granted anyhow. We granted this increase because of our faith in you and in the future of this plant. We cannot say at this time how much of an increase you would have already been granted this year if it were not for the union

activity but it was certainly greater than what was granted last year.

"Another program that we had initiated in your behalf before the union organizational activity began was a job evaluation program. I have letters in my office dating back to August, 1965, concerning the establishment of this program. On January 10th of this year, I wrote a letter to Harrison Martin [another supervisor] telling him that we had completed writing job specifications and were ready to proceed with this program so that it could be tied in with our annual review of wages and fringe benefits. Again we were unable to proceed with this program, which would have been beneficial to you, because of the union organizational activity." C.T. 13.

The Regional Director concluded that

"by the above-quoted remarks, the Employer sought to discredit the [union] and discourage the employees from voting for the [union] by announcing a previous intent to provide benefits for the employees and shifting to the [union] the onus for failure to institute these benefits. It is further concluded that this conduct was calculated to interfere with and discourage the employees' choice of the [union] as their bargaining [representative]." C.T. 13.

■ It is petitioner's contention that the Regional Director erred in taking the comments referred to "out of context," and that at least one of two speeches which followed that by Hughes corrected the erroneous impression which the Regional Director believed was conveyed by the Hughes' speech. It may be conceded that a careful reading of all three speeches together might perhaps yield—particularly to one versed in the law governing labor relations—an accurate impression of what the company claims was its position: that it dared not institute improvements or confer benefits during the pre-election period for fear that it would be charged with an unfair labor practice. See NLRB v. Ex-

change Parts Co., 375 U.S. 405, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964). And of course as a general rule comments to employees should be viewed in light of the total context in which they were made.

■ The Board has broad discretion, however, in certifying or setting aside the results of representation elections. And we cannot hold that it was unreasonable for the Regional Director to focus on the Hughes speech as he did. The portion of that speech which was complained of made no mention of a desire to avoid charges of vote-buying, and was thus subject to the interpretation put upon it by the Director; and there is no guarantee that the employees who heard that portion heard—or, particularly since they were untrained in the intricacies of labor law, that they absorbed or comprehended—the equally brief parts of the later speeches which petitioner claims "cured" Hughes' comments.

There is a limit, of course, to the extent to which isolated and insignificant remarks by employer or union representatives may be taken out of context or blown out of proportion by the Board. Moreover, especially since the inference which the Regional Director chose to draw from Hughes' comments is not an inescapable one—and since it is desirable that an employer be able to explain to his employees the bearing that fear of an unfair labor practice may legitimately have on his conduct—we can concede that the Board may here have approached that limit. Upon reflection, however, we are constrained to hold that the line was not crossed and that the decision to set aside the first election was within the Board's discretion.

Petitioner's claim that section 8(c) of the Act bars the conclusion we have reached must be rejected. That section provides,

"The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(c) (1964).

Here, however, Hughes' speech directly resulted not in the finding of an unfair labor practice, but merely in the invalidation of the first election.

There is some force to petitioner's contention that the distinction between a ruling that an unfair labor practice has been committed and a decision to set aside an election is not really meaningful so far as the strictures of section 8(c) are concerned. For when an employer challenges an adverse representation decision by refusing to bargain with the winner of a subsequent election —as an employer must do in order to secure review of such a decision—an employer will of course be found to have violated section 8(a) (5) of the Act if the representation decision is upheld. Speech protected by section 8(c) may, then, play a real part in the ultimate finding of an unfair labor practice. We read Foreman & Clark, Inc. v. NLRB, 215 F.2d 396, 408–409 (9th Cir.), cert. denied, 348 U.S. 887, 75 S.Ct. 207, 99 L.Ed. 697 (1954), however, as committing this court to the contrary position —a position we cannot conclude is unsound. See also NLRB v. Shirlington Supermarket, Inc., 224 F.2d 649, 652–653 (4th Cir.), cert. denied, 350 U.S. 914, 76 S.Ct. 198, 100 L.Ed. 801 (1955).

## II. THE SECOND ELECTION

Before the Regional Director, Sonoco challenged the results of the second representation election in three respects. On each issue the Director ruled against petitioner without conducting a factual hearing. In the subsequent unfair labor practice proceeding the trial examiner and the Board also denied a hearing, on the ground that Sonoco was precluded from relitigating questions already determined in the representation proceeding. Sonoco claims now that it should, according to the Board's rules, have had a hearing at the representation stage

and that, in any event, the failure of the Board to grant a hearing at any stage of the proceedings constituted a denial of due process of law. We agree with the first of those contentions.

The Board's regulations provide that challenges to representation elections

"may [be ruled upon by the Regional Director] on the basis of an administrative investigation or, *if it appears to the regional director that substantial and material factual issues exist which can be resolved only after a hearing, [on the basis of a] hearing on said issues before a hearing officer."* 29 C.F.R. § 102.69(c) (1968) (emphasis added).

The Second Circuit has noted, with respect to an almost identical regulation, 29 C.F.R. § 102.69(e) (1968), that use of terms such as "may" and "appears to the Regional Director"[3] does not mean that the decision whether a hearing is called for is committed to an unfettered administrative discretion:

"In consequence a court cannot properly enforce an order finding an employer guilty of an unwarranted refusal to bargain with a union certified in an election if it appears, with respect to challenges affecting the result, either that they were disposed of erroneously as a matter of law or that the employer raised 'substantial and material factual issues' under the Regulations and was denied a hearing that he seasonably requested." NLRB v. Joclin Mfg. Co., 314 F.2d 627, 631–632 (2d Cir. 1963).

This conclusion represents, we believe, a proper interpretation of the regulation in question, in view of the hearing safeguards specifically guaranteed by section 10(b) of the Act[4] and, more generally, by the due process requirements of the Constitution.

We do not mean to suggest that a party challenging a Board election is always guaranteed a hearing. "An essential prerequisite to the right to a hearing is something to be heard." NLRB v. Carolina Natural Gas Corp., 386 F.2d 571, 574 (4th Cir. 1967). In the Second Circuit's decision in NLRB v. Joclin Mfg. Co., supra, the court stated:

"[W]e in no way criticize the Board's thus conditioning the right to a hearing on a showing that factual issues are 'substantial and material'—a requirement not only proper but necessary to prevent dilatory tactics by employers or unions disappointed in the election returns * * *." 314 F.2d at 632.

Accord, NLRB v. J. R. Simplot Co., 322 F.2d 170, 172 (9th Cir. 1963). We merely hold that the "substantial and material factual issues" test set out in the Board's regulations provides a proper and appropriate standard for judging whether a party challenging the results of a representation election should have the benefit of a hearing. It is against that standard that we judge the correctness of the Board's failure to grant petitioner the hearing it sought.

3. The Second Circuit dealt with the phrase "appears to the Board."

4. 29 U.S.C. § 160(b) (1964):

"Whenever it is charged that any person has engaged in or is engaging in any * * * unfair labor practice, the Board, or any agent or agency designated by the Board for such purposes, shall have power to issue and cause to be served upon such person a complaint stating the charges in that respect, and containing a notice of hearing before the Board or a member thereof, or before a designated agent or agency, at a place therein fixed, not less than five days after the serving of said complaint * * *. The person so complained of shall have the right to file an answer to the original or amended complaint and to appear in person or otherwise and give testimony at the place and time fixed in the complaint. In the discretion of the member, agent, or agency conducting the hearing or the Board, any other person may be allowed to intervene in the said proceeding and present testimony. * *"

See also the provisions of the Administrative Procedure Act, 5 U.S.C. §§ 1001–1011 (1961).

### A. *The Alleged Threats to Employee Jack Mendonca*

Petitioner presented to the Regional Director evidence concerning three incidents bearing on whether the second election was fairly conducted in an atmosphere free from coercion and similar impropriety. Its basic position is that that evidence, summarized in an affidavit executed by Plant Manager Hughes and a written statement by employee Jack Mendonca, was sufficient to raise "substantial and material factual issues." We will first consider that contention with respect to certain alleged threats made to Mendonca.

Mendonca's statement asserts that on the date of the first election he was sitting in his car across the street from Sonoco's Hayward plant with a sign reading, "Better Red Than Dead" propped against the car. Three union agents allegedly asked if Mendonca was calling them communists, and proceeded to tear up the sign. A discussion ensued during which, Mendonca claims, he was ordered to "get back in my f..... car" and told that if he didn't leave immediately "they would kick my ass" and "beat the hell out of [me]." C.T. 92. Hughes' affidavit continues:

"After the first election, Mr. Mendonca told me that he and his relatives received telephone calls from some Union agent or agents. He told me that as a result of these telephone calls he was afraid of what might happen to him. Some time later, prior to the second election, Mr. Mendonca came to me and said that the matter had been cleared up and that he was no longer afraid. I understood that what he referred to as 'cleared up' meant that his mind had been changed and that he intended to vote for the [union] in the second election because of certain threats made to him and his relatives by Union representatives. Mr. Mendonca did inform me that he voted against the [union] in the first election, and I am convinced that he changed his vote at the second election because of fear for himself and his family. I believe that Mr. Mendonca would so testify before the Board, if brought there by subpoena and placed under oath, and would also verify the threats received as set forth in his written statement and as related by him to me. I do not believe that any voluntary written statement will be forthcoming from Mr. Mendonca at this time due to his fear of Union reprisal." C.T. 88–89.

With respect to the alleged threats on the day of the first election, the Regional Director commented,

"Assuming *arguendo*, that the incident occurred as related [in Mendonca's statement], it occurred prior to the issuance of the Notice of the Rerun Election, and therefore is not a basis for setting aside the election." C.T. 44.

His conclusions regarding the subsequent telephone calls—conclusions evidently based on the Board's own investigation —were as follows:

"Prior to the rerun election, relatives of [Mendonca] received telephone calls from a union agent. The agent and the relatives were personal friends. The agent asked the relatives to talk to [Mendonca] to find out why he was against the [union]. He also asked them to set up a meeting with [Mendonca] so that he could explain the benefits resulting from unionization * * *. Thereafter, [Mendonca] called the union agent. The agent asked why he did not support the Union and [Mendonca] replied that he just did not want to be in the Union. The agent asked why he had been in front of the plant with a sign prior to the first election. [Mendonca] stated that he felt this action had been harsh and that he would not engage in such activities again. The discussions were friendly and there is no evidence of threats of economic or physical harm by the union agent." C.T. 45.

The Board concedes that in refusing to consider evidence of the election-day

incident the Regional Director applied a standard that is incorrect under the rule of The Singer Co., 161 N.L.R.B. 956 (1966).[5] In *Singer* the Board announced that

> "the critical period [during which threats or similar incidents may be considered in deciding whether to invalidate a] second election *begins running from the date of the first election.*" 161 N.L.R.B. at 956 n. 2 (emphasis added).

We do not think that this statement determines the question before us, however. For it is not clear whether incidents occurring *on* the day of an initial election should be included within the period "running from" that date. None of the other cases cited by counsel deals with the question. We must, nevertheless, decide it.

In our view application here of the rule announced in *The Singer Co.* does not preclude consideration of the alleged election-day incident involving Mendonca. The facts of this case—both admitted and alleged—suggest the problems, in fact, with establishing any "cut-off date" such that evidence of events before that date will be entirely excluded from consideration in deciding whether election results should be certified. The relation between successive elections is ordinarily direct and intimate. And it would defy common sense to conclude that in no instance could threats—no matter how severe—relating to the first election exert an influence in the second. Applied to a specific case, such a conclusion has even less basis when telephone calls in the interim are asserted to have made the recipient of the earlier threats "afraid."

■ The Board has chosen to establish such a cutoff date, of course, rather than to allow the time lapse between the alleged threat and the subsequent election to affect the *weight* given to the threat by the trier of fact; and we need not here question its authority to insti-

tute such a rule. We do, however, conclude in light of what we have said that the rule should be construed so as to allow consideration of events occurring on the day of the first election. It is perfectly conceivable that, if it appears on election day that challenges based on threats or similar conduct will be forthcoming, the contestant who has engaged in such conduct might suggest to employees—with a greater or lesser degree of subtlety—that "if there's a second election, what we said goes double." Our view of the Board's *Singer* rule at least allows *consideration* of such suggestions.

■ The Regional Director erred, therefore, in refusing to consider the threats allegedly made to Mendonca on the day of the first election. Standing alone, those asserted threats would be enough to justify invalidation of the second election. In combination with Hughes' statement that Mendonca expressed fear as a result of the subsequent telephone calls, they clearly provide such justification. The Regional Director cannot cause Hughes' statement to vanish by conducting his own examination; although the Board's agents may discover evidence suggesting one result, that does not mean, when an employer or union has presented evidence to the contrary, that there is no "substantial and material factual issue."

■ We need not decide whether or not a detailed offer of proof will suffice to raise such an issue. Cf. NLRB v. Tennessee Packers, Inc., 379 F.2d 172, 178 (6th Cir.), cert. denied, 389 U.S. 958, 88 S.Ct. 338, 19 L.Ed.2d 364 (1967). For here, the petitioner has by the presentation of *evidence* met its burden of "clearly demonstrat[ing] that [a] factual issue exist[s] which can only be resolved by an evidentiary hearing." NLRB v. Tennessee Packers, Inc., supra, 379 F.2d at 178. If the assertions contained in Hughes' and Mendonca's statements are true, it seems to us undeni-

---

5. The *Singer* case was decided after the Regional Director made his ruling. The

Board concedes, however, that *Singer* governs the present case.

able that there might well have been interference with Mendonca's free choice in the second election, and that a hearing is required to determine that question. A shift of one vote would, of course, have changed the result of the second election.

B. *The Telephone Call to Employee James Scroggins*

Hughes' affidavit also states that he had been given certain information by employee James Scroggins:

"On the night of August 16, 1966, Mr. Scroggins relates that he received a telephone call from a Mr. Fagerhaugh. Mr. Fagerhaugh told Mr. Scroggins that the foreman, Mr. Danny Stewart, was not going to be allowed to vote in the election and that Mr. Stewart was out to get Mr. Scroggins fired. Mr. Scroggins told me that Mr. Fagerhaugh stated to him at that time that he, Scroggins, had better vote for the [union] if he wanted to keep his job. Mr. Ole Fagerhaugh is known by me to be an organizer for Local No. 6, International Longshoremen's and Warehousemen's Union. I have been told by Mr. Danny Stewart that after the first election, he received a telephone call from Mr. Fagerhaugh who tried to get him to make some statement that the Company had threatened and coerced the employees." C.T. 89–90.

The Regional Director commented upon this claim in the following manner:

"[Scroggins] denies being told that he had better vote for the Union in order to preserve his job. Investigation discloses that [Stewart] had made certain complaints about [Scroggins] to the union agent and to other employees. There is no evidence that the union agent substantially misrepresented [Stewart's] attitude toward [Scroggins]. Since the investigation failed to substantiate this objection, it is hereby overruled." C.T. 45.

■ Again, however, the fact that in talking with a Board representative Scroggins may have denied having been told that "he had better vote for the union in order to preserve his job" does not dispel the fact that Hughes' affidavit states Scroggins stated the contrary information. Nor is the absence of "evidence that the union agent substantially misrepresented [Stewart's] attitude" by any means conclusive. One wonders, if there was no "substantial" misrepresentation, whether there was perhaps *some degree* of misrepresentation.[6] But in any event, Hughes' affidavit suggests that the union representative's statements might well have interfered with the "laboratory conditions" sought by the Board. Concededly it is possible that the union agent made only a general statement to the effect that the union would help protect employees against personal bias on the part of supervisors. But the more likely interpretation of the comment, as it was related by Hughes, is that Scroggins was either (1) threatened with loss of his job, or (2) promised that regardless of whether his performance was poor or Stewart's complaints justified, the union would see to it that he kept his job. A hearing—where, for instance, Scroggins can be questioned concerning his apparently conflicting statements relating to the agent's call and regarding the actual tenor of that call—is the proper method of examining and resolving the question. We believe that here also the petitioner's evidence raises a substantial and material factual issue.

6. The Regional Director's conclusory statement exemplifies an administrative approach to factual questions which makes judicial review a difficult and frustrating business. The Director's judgment regarding whether a misrepresentation is "substantial"—or regarding the more general question of whether a hearing is called for—is of course not immune from review. Yet his failure to suggest even briefly just what the Board's investigation found Stewart's attitude to be would seriously obstruct any serious attempt to focus review on the question of misrepresentation. Fortunately the question here is more peripheral than essential to our decision and is mentioned primarily for purposes of illustration.

## C. *The Ray Gonzales Incident*

Hughes' affidavit finally relates an incident occurring on the day of the second election:

" * * * Mr. Ray Gonzales, a former employee of Sonoco Products Company, was driven to the plant. He walked up to the employee's entrance where a number of employees were standing. The polls were open inside that plant at the time. Mr. Gonzales was told that he had no business being there and was asked to leave and not to interfere with the election. Mr. Gonzales mumbled something that gave the impression that he would not leave, and he was again asked to do so. Mr. Gonzales then yelled to one of the employees standing on the steps and then reluctantly turned and left the plant. I saw him leave in a car, drive out of the plant and across the road alongside the plant where he parked.

"As Mr. Fagerhaugh and Mr. William Burke (also a representative of Local 6 ILWU) were returning to the plant for the counting of the ballots, I observed that they stopped and talked to Mr. Gonzales. Both cars then drove back on the property. I went out to the parking lot and told Mr. Gonzales that he was trespassing and asked him to leave. Mr. Fagerhaugh stated that Mr. Gonzales was with him, that he was one of the organizers for the Union and therefore was not trespassing. I stated that I had not previously been informed of this and told Mr. Fagerhaugh to ask Mr. Gonzales to leave Company property. Mr. Fagerhaugh then became angry and yelled in a loud voice for the employees nearby to hear, that Mr. Gonzales was a Union organizer. Mr. Burke interceded and told Mr. Fagerhaugh not to make an issue of it. Mr. Gonzales than left the Company property." C.T. 90–91.

With respect to these allegations the Regional Director concluded,

"Investigation reveals [Gonzales] was a former employee who was the subject of a pending unfair labor practice charge. The investigation discloses that he was met by a management official before he reached the polls and was asked to leave the property. He left without speaking to other employees except to ask one of them to drive him in his automobile off the property. As he was not near the polls and did no campaigning, I find it unnecessary to determine whether or not he was an agent of the [union]." C.T. 46.

■ We agree that, standing alone, Hughes' assertions would not call for a hearing. Even if true, they do not suggest any interference with employee free choice sufficient to call for invalidation of the election; the cases cited by petitioner uniformly involve electioneering conduct of a more serious nature.

■ However, we have found Sonoco's claims relating to Mendonca and Scroggins to present substantial and material factual issues. And it is the totality of circumstances in any particular case that determines whether a free and fair election was held. A situation is thus conceivable (although unlikely) in which Gonzales' conduct, though insufficient in itself to justify overturning the second election, is in combination with the Mendonca and Scroggins incidents enough to tip the balance and require a new election. See Home Town Foods, Inc. v. NLRB, 379 F.2d 241, 244 (5th Cir. 1967). In other words, petitioner has raised a substantial and material factual issue as to whether, in combination, *all of the circumstances* on which it relies prevented a fair election. Therefore we conclude that unless the Board assumes the truth of Hughes' allegations regarding Gonzales' conduct and status as a union agent it must grant a hearing with respect to those issues. And in any event it must consider the Gonzales incident along with the Mendonca and Scroggins issues in determining whether to set the second selection aside.

We decline to order enforcement of the Board's order. Instead, we set aside the order and remand to the Board for further proceedings consistent with this decision.