**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**SOUTHERN PAPER BOX COMPANY, Respondent.**

**No. 74–1033.**

United States Court of Appeals, Eighth Circuit.

Submitted May 16, 1974.

Decided Nov. 11, 1974.

Rehearing and Rehearing En Banc Denied Dec. 17, 1974.

Jonathan Axelrod, N.L.R.B., Washington, D. C., for petitioner.

Gaines N. Houston, Little Rock, Ark., for respondent.

Before GIBSON, Chief Judge, WEBSTER, Circuit Judge, and WILLIAMS*, District Judge.

WEBSTER, Circuit Judge.

This case comes before the court on a renewed application for enforcement of an order of the National Labor Relations Board directing Southern Paper Box Company to bargain with the United Papermakers and Paperworkers, AFL–CIO. A certification election was

held on April 9, 1971, which the union won by a vote of 83 to 72. The company filed six objections with the Board and, after an investigation by the Regional Director, the Board overruled the objections without a hearing and certified the union. The company refused to bargain on request and the Board filed a § 8(a)(5) complaint which resulted in an order to bargain.[1] On the original petition we denied enforcement without prejudice, NLRB v. Southern Paper Box Co., 473 F.2d 208, 212 (8th Cir. 1973), because two of the six objections raised "substantial and material factual issues" necessitating a hearing."

The two objections were (1) that "employees had been threatened with loss of jobs, property damages and physical violence unless they continued to support the Union" and (2) that a union representative told employees that the company president "had taken bonus money due the employees in 1970 and had used the money to finance a trip to Europe." 473 F.2d at 210–211. We held that these objections required a hearing and articulated the issues as follows:

> [W]e feel an adversary hearing is necessary to determine whether the threats were made, how broadly they were communicated and whether they created an atmosphere of fear and reprisal so as to render a free expression of choice impossible.
>
> *    *    *    *    *    *
>
> [In regard to the bonus money] . . . the crucial questions are whether or not the statement was made, and whether or not Southern had an opportunity to respond. It is imperative that these disputed factual issues be resolved in an adversary hearing. 473 F.2d at 211.

On remand, Administrative Law Judge Benjamin B. Lipton conducted the required hearing, limiting the issues to those articulated by this court. He con-

---

* The Honorable Paul X Williams, United States District Judge, Western District of Arkansas, sitting by designation.

1. The Board's decision and order are reported at 193 NLRB 881, 78 LRRM 1464 (1971).

cluded from the evidence, based in substantial part on his credibility findings, that the company had "failed to sustain its 'heavy burden' of establishing that threats were made which created an atmosphere of fear and reprisal so as to affect the free choice of employees in the Board election" and that the statements made by a union representative regarding the bonus money

> were not unknown to the employees, and were not so misleading, or beyond the employees' own ability to evaluate, —as to materially affect their free choice in the election. Furthermore, the facts are that Respondent, through its supervisors, had essential knowledge of the statements in question over a substantial period preceding the election, that it did attempt to explain the bonus cut by its letter and its posting on the bulletin board, and to the extent it desired to answer the *ad hominem* implication against Karcher, it had ample opportunity to do so before the election. Southern Paper Box Co. and United Paperworkers International Union, No. 26–CA–4073 (NLRB, June 26, 1973), Slip Opinion at 11.

The Board adopted the findings of the Administrative Law Judge with certain exceptions [2] and again ordered the company to bargain with the union [3] and thereafter renewed its petition for enforcement. We have carefully reviewed the record in this close and difficult case and conclude that the Board's findings are supported by substantial evidence in the record as a whole.

### I

The company was in the practice of paying bonuses to employees each September or October based on the profits during the previous fiscal year. In 1970 the bonuses paid were only half the amount paid in 1969. In a letter accompanying the 1970 bonus the company explained without detail that its profits for the previous year did not justify a larger bonus. In June of 1970 the company's president had taken a European cruise. The company was aware that employees were unhappy with the bonus cut. In December, 1970, and thereafter until the election the scuttlebutt among employees was that the company president had used the difference in bonus money to finance his trip to Europe. At one of the union meetings prior to the election, Waylon Brown, an international representative of the union, made a statement in response to some audience comment about the president's trip, "Well: that's probably where the rest of your bonus went." [4] Similar statements were made by Brown to two employees in their homes. Three weeks before the election an employee told a supervisor that employees were unhappy because the president had used the bonus money to go overseas and buy new equipment. This was reported to a vice president who commented, "It's one of those things." The company president did not learn of this employee attitude until the day of the election, when a supervisor told him that he had heard from employees that the president's using the bonus money to finance his European cruise was probably the reason the union won the election.

Judge Lipton found that Brown's statements were merely a reiteration of current employee speculation by one

2. The Board disagreed with the Administrative Law Judge's conclusions based on the evidence in several instances. The Board did not question any of the Judge's credibility findings. This court is charged with reviewing the findings and conclusions of the Board, NLRB v. Hawthorn Co., 404 F.2d 1205, 1209 (8th Cir. 1969) and not those of the examiner, but we do note the points of disagreement where relevant.

3. The Board's decision and order are reported at 207 NLRB No. 3, 84 LRRM 1469 (1973).

4. This is the Administrative Law Judge's reconstruction of the remark since no one remembered the precise language and it was disputed whether Brown said "probably" or not. This approximation of Brown's comment is clearly supported by substantial evidence in the record as a whole.

whose source was not any more knowledgeable than any other employee spreading the rumor and that the company was aware of the rumor at least two weeks before the election. He was also of the view that the employer, even if it had responded, could have done little "to counter the employees' real resentment relating to the fact of the bonus cut." The Board approved Judge Lipton's findings on this issue and concluded, "We do not find Brown's remarks to be 'campaign trickery' but merely a typical response in line with then current employee speculation, to which Respondent could have addressed itself had it desired to do so." Southern Paper Box Co., 207 NLRB No. 3, 84 LRRM 1469, 1471 (1973).

■ These findings are supported by substantial evidence in the record as a whole. The question remains as to whether it is reasonable to characterize Brown's remarks as "a typical response in line with then current employee speculation" and thereby attribute no significance to them. The Board is entitled to considerable discretion in supervising elections under its jurisdiction and great deference should be accorded its views. Macy's Missouri-Kansas Division v. NLRB, 389 F.2d 835, 842 (8th Cir. 1968); see NLRB v. Gissel Packing Co., 395 U.S. 575, 612 n. 32, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). A reasonable conclusion by the Board based on the evidence will not be disturbed even though the reviewing court could justifiably reach a different conclusion. NLRB v. Saunders Leasing System, Inc., 497 F.2d 453 (8th Cir. 1974); NLRB v. Louisiana Manufacturing Co., 374 F.2d 696, 703 (8th Cir. 1967); NLRB v. Morrison Cafeteria Co., 311 F.2d 534, 536 (8th Cir. 1963). The Board did not condone Brown's remarks but merely held that under the circumstances of this case and in light of the employer's knowledge of the employees' speculation the incident did not justify an order requiring a new election. This is a matter squarely within the scope of the Board's expertise and we cannot say that the conclusion of the Board here is unreasonable.

## II

■ The evidence of threats and of an atmosphere of fear and reprisal consists primarily of testimony of incidents in which individual employees were threatened or perceived themselves as being threatened by pro-union employees. While the evidence sustains the Board's view that these incidents were not widely disseminated among the company's approximately 170 employees, it is also apparent that the two-year lapse between the election and the hearing caused by the Board's original refusal to grant a hearing in this case severely impaired the fact finder and this court in ascertaining what actually occurred during the weeks preceding the election. Much of the testimony was discredited by the Administrative Law Judge at least in part because witnesses could not remember details pertaining to the incidents about which they testified.[5] Yet those credibility findings to the extent

5. The Administrative Law Judge discredited much of employee Hazel Reed's testimony as greatly exaggerated and implausible. She testified that two male employees talked of "blowing up" the house and car of another employee and a foreman who opposed the union. These alleged threats were made in her presence and she felt they were intended for her benefit which prompted her to carry a gun until after the election. Two other incidents were generally discredited by the Administrative Law Judge. Employees Alma Jean Ellis and Mae Ollie Hoover testified that one afternoon at the timeclock Richard Lawson, one of the men allegedly involved in the Reed incident, threatened Hoover with a knife. Hoover was not aware of the knife until Ellis told her about it the following morning and no reference to the union was connected with the incident. Hoover also testified that Lawson had told her on another occasion that if she did not support the union she would lose her job and he would "catch" her "away from there." The Administrative Law Judge both discredited this testimony and held that "[e]ven if made, I would not find such statements by Lawson rise to the level of actual threats . . . ." The Board rejected the latter conclusion, but accepted the Administrative Law Judge's credibility assessment. 84 LRRM at 1470 n. 6.

adopted by the Board are binding on this court, absent "extraordinary circumstances" which do not exist in this case. NLRB v. Penzel Construction Co., 449 F.2d 148, 149 (8th Cir. 1971). *See also* NLRB v. International Longshoremen's & Warehousemen's Local No. 8, 473 F.2d 15 (9th Cir. 1973); NLRB v. Red Top, Inc., 455 F.2d 721, 724–725 (8th Cir. 1972).

■■ There was additional evidence that some employees were being pressured by pro-union employees to support the union. Particularly disturbing is an incident recounted by employee Paul Mons. Mons testified that some two weeks prior to the election he was working in the printing department when Supervisor Faker Hall came into the area. Employee Richard Harris approached Mons and said, out of Hall's hearing, if "Hall didn't change his mind about the union that he would burn his house down." Mons did not tell Hall or anyone else about Harris' statement until after the election.[6] Judge Lipton concluded:

> I find that the threat was not directed against an employee and was not within the awareness of employees other than Mons. As expressed, Harris' statement is ambiguous as to whether he was speaking for or against the Union.

Southern Paper Box Co. and United Paperworkers International Union, No. 26–CA–4073 (NLRB, June 26, 1973), Slip Opinion at 7.

The Board rejected the conclusion that Harris' remark was ambiguous because the record established "that Harris was a well-known union sympathizer."[7]

■ The Board concluded that notwithstanding the existence of unsavory incidents and actual threats, the evidence did not demonstrate that the election was conducted in an atmosphere of fear or reprisal which rendered a free election impossible. *See* Manning, Maxwell & Moore, Inc. v. NLRB, 324 F.2d 857, 858 (5th Cir. 1963). Of particular significance is the absence of evidence that the incidents complained of were known by employees other than those directly involved. Some 160 employees voted in this election, and only a handful have been identified as participants in the unfortunate occurrences which are the subject of these protracted proceedings. The election fell short of the ideal "laboratory conditions" contemplated by the National Labor Relations Act, but on this record we cannot overturn the Board's conclusion that the results of the election three years ago accurately reflected the free choice of the employees of this plant. The Board's findings are supported by substantial

---

Another incident deemed implausible by the Administrative Law Judge was Katie Williford's testimony that employee James Keaton told her that a gas station operated by her family "could be burglarized or broken into" and that she might lose her job if she did not support the union. The threat of job loss was heard by other employees, one of whom testified to that effect, and the Administrative Law Judge generally discredited the "burglary" threat, concluding the latter would "reasonably be regarded as a vague prediction, rather than a threat that Keaton himself would carry out." This conclusion was also rejected by the Board, but the credibility assessment was accepted. 84 LRRM at 1470 n. 8.

6. Mons testified that he told employee Hoover about the incident the same day, but this testimony was expressly rejected by Judge Taylor

as contrary to Mons' affidavit to the Board in which he stated that he "did not repeat it to Hall or anyone else before the election."

7. However, the Board did agree that the remark was not directed at an employee, and in oral argument before this court the Board suggested that threats directed at supervisory personnel should be treated differently than threats made against employees eligible to vote. We expressly reject such a distinction. Threats are a form of intimidation. A pervasive atmosphere of intimidation taints the integrity of an election and it matters not at whom the threats are directed if the intended atmosphere is achieved. In fact, there is every reason to believe that the successful intimidation of supervisors will result in increased pressure upon employees to vote in the desired manner.

evidence in the record as a whole, and the inferences and conclusions drawn therefrom in its Order are permissible and reasonable.

The Order of the Board directing Southern Paper Box Company to bargain with the union is hereby enforced.

GIBSON, Chief Judge (concurring).

I concur in Part I of the majority's opinion relating to the "bonus money" objection. I reluctantly concur in Part II of the majority's opinion and in ordering enforcement of the Board's order directing Southern Paper Box Company to bargain with the United Papermakers and Paperworkers, AFL–CIO. My reluctance stems not from a disagreement with the majority but is occasioned by what I view as an abdication by the Board of its responsibility to assure that the results of a representation election reflect the free choice of all employees.

The present Board rule that nonparty misconduct must create an atmosphere of general fear and reprisal before an election will be set aside seems to me, as it did to the Board at an earlier stage in its history, a dereliction of its duty to assure that all employees are able to make a free and uncoerced decision as to a bargaining representative. *See* G. H. Hess, Inc., 82 N.L.R.B. 463, 466 (1949) wherein an earlier Board stated:

An election serves its purpose only if it affords an opportunity for *all* employees to register a free and un-coerced choice of bargaining representative. Manifestly, this purpose has failed of achievement where, as here, an employee has been the object of threats of bodily harm designed to thwart the exercise of a basic right guaranteed by the Act, i. e. the right

to cast a ballot for or against a bargaining representative. We would be derelict in our duty, indeed, if, under these circumstances, we did not safeguard this right. (Emphasis in original.)

The employer in this case has a real basis for complaint. Threats and intimidation were employed by known union sympathizers in an attempt to influence employees' votes. The employer's attempt to have a hearing upon his objections was thwarted by the Board's refusal to hold a hearing, necessitating this court's remand in the prior enforcement proceeding. N. L. R. B. v. Southern Paper Box Co., 473 F.2d 208 (8th Cir. 1973). The employer was then hindered by the two-year delay between the election and Board hearing and by unnecessarily restrictive rulings of the Administrative Law Judge from fully developing its evidence of the threats and general atmosphere of the plant immediately prior to the election.

The Board, instead of taking a mild view of threats and intimidating tactics falling short of creating a general atmosphere of fear and reprisal, should take a strong stand against the use of any intimidating tactics employed by either party or its adherents. While Board elections are not lightly to be set aside, neither are they inviolate. More important in the election context than the interests of the Board, employer, or union in having a conclusive result is the right of each individual employee to freely express his selection or rejection of a representative without coercion.

Yet, while my views differ from those of the present Board on these policy matters and the weight of the evidence in this particular case, I am not at liberty to substitute my judgment for that of the Board. Therefore, I concur.