## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

## VAN GORP CORPORATION, Respondent.

### No. 79–1351.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 7, 1979.

Decided Feb. 15, 1980.

Helen Morgan, Atty., N. L. R. B., Washington, D. C. (argued), William F. Wachter, Atty., John S. Irving, Gen. Counsel, John E. Higgins, Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, and Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., on brief, for petitioner.

Thomas O. McCarthy, McMahon, Berger, Breckenridge, Hanna, Linihan & Cody, St. Louis, Mo. (argued), Thomas M. Hanna, St. Louis, Mo., on brief, for respondent.

Before LAY, Chief Judge,* BRIGHT and McMILLIAN, Circuit Judges.

McMILLIAN, Circuit Judge.

The National Labor Relations Board (hereinafter the Board) petitions for enforcement of its order requiring respondent

* The Honorable Donald P. Lay became Chief Judge of the Eighth Circuit on January 1, 1980.

Van Gorp Corporation (hereinafter Van Gorp) to bargain with the United Automobile, Aerospace and Agricultural Implement Workers, International Union, UAW (hereinafter the Union), as the exclusive bargaining representative for certain of its employees. For the reasons stated below, we deny the petition for enforcement.

In a representation election conducted by the Board on October 21, 1977, the Union was selected by a majority of certain production workers at Van Gorp as their bargaining representative.. The vote was 51 to 46 with no challenged ballots. Van Gorp made timely objections to the Board over conduct of the election. A Board hearing officer, after conducting a hearing on the objections, recommended on February 3, 1978, that the Board overrule all the objections and certify the Union as bargaining representative for an appropriate unit. On March 6, 1978, the Board's regional director issued a decision accepting the recommendations of the hearing officer and rejecting Van Gorp's exceptions. In May, 1978, the Board, suggesting that Van Gorp had not raised any substantial issues, declined to review this decision.

Van Gorp, however, continued to object to the certification of the Union, and therefore refused to bargain with the Union as representative of its employees. On June 22, 1978, the Union filed a charge of unfair labor practice, and on February 7, 1979, the Board issued the bargaining order now before us. *Van Gorp Corporation*, 240 N.L. R.B. No. 86 (1979).

Only by refusing to bargain could Van Gorp obtain judicial review of the Board's decision certifying the Union as the bargaining agent for Van Gorp's workers. *See LaCrescent Constant Care Center, Inc. v. NLRB*, 510 F.2d 1319, 1321, n.6 (8th Cir. 1975). The National Labor Relations Act, 29 U.S.C. § 151 *et seq.*, does not, in general, provide for judicial review of Board representation proceedings until, on the basis of the certification, the Board has entered a bargaining order or other compulsory order against the challenging party.[1] Under § 9(d) of the Act, 29 U.S.C. § 159(d), once a Board order comes before this court for review, the certification proceedings underlying the order may also be brought before the court for review. *See Boire v. Greyhound, Inc., supra*, 376 U.S. at 477, 84 S.Ct. at 896. In reviewing the certification proceedings underlying the Board's order for the employer to bargain with the certified Union, we apply the rule of § 10(e) of the Act, 29 U.S.C. § 160(e), that the Board's findings are to be upheld if supported by substantial evidence on the record considered as a whole. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *Gulf Coast Automotive Warehouse Co. v. NLRB*, 588 F.2d 1096 (5th Cir. 1979). The certification proceedings may be reviewed substantively along with the bargaining order. In this case the Board, while considering the unfair labor practice charge, reopened and reaffirmed its earlier certification of the Union. *Van Gorp Corporation, supra*, 240 N.L.R.B. No. 86 (slip opinion at 5 n.2).[2]

1. One exception is where the Board, even if correct in its findings, has clearly exceeded its statutorily granted powers. *Compare Leedom v. Kyne*, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958), *with Boire v. Greyhound, Inc.*, 376 U.S. 473, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964).

2. The Board reconsidered the certification proceedings to clarify the standard under which it evaluated Van Gorp's objections to the certification of the Union as bargaining representative of its workers. In 1962, the Board set forth its standards for setting aside an election because of misrepresentations by a party in *Hollywood Ceramics Co.*, 140 N.L.R.B. 221 (1962) (see *infra*). However, in 1977, the Board announced a change of standard in

*Shopping Kart Food Market, Inc.*, 228 N.L.R.B. 1311 (1977), and seems to have applied this change in its May, 1978, refusal to review the certification of the Union as representative of Van Gorp employees. But in December, 1978, the Board returned to the *Hollywood Ceramics* standard for this kind of case. *General Knit of California*, 239 N.L.R.B. No. 101 (1978). In the instant unfair labor practice proceeding, the Board therefore found it necessary to reevaluate the certification of the Union under the *Hollywood Ceramics* standard, a standard which we believe to be a sound exercise of the Board's discretion and therefore apply in this case as the standard for determining the validity of the representation election. We note that this case presents no occasion to review the

Challenging the certification of the Union, Van Gorp argues that last minute misrepresentations by the Union compel setting aside the October 21, 1977, election.[3] In addition, Van Gorp contends that the election was tainted by coercive conduct of employees who were Union supporters. We think that, considering the record as a whole, there was not substantial evidence to support the Board's conclusion that the election result expressed a free and fair choice of bargaining representative by the Van Gorp work force.

## I.

The standard for determining if an election should be set aside on the basis of a misrepresentation was set forth by the Board in *Hollywood Ceramics Co.*, 140 N.L.R.B. 221, 224 (1962):

We believe that an election should be set aside only where there has been a misrepresentation or other similar campaign trickery, which involves a substantial departure from the truth, at a time which prevents the other party or parties from making an effective reply, so that the misrepresentation, whether deliberate or not, may reasonably be expected to have a significant impact on the election.

This standard has been reaffirmed by the Board in *General Knit of California, Inc.*, 239 N.L.R.B. No. 101 (1978), and it is the standard applied by this court. *See, e. g., LaCrescent Constant Care Center, Inc. v. NLRB, supra*, 510 F.2d at 1321–22 (8th Cir. 1975); *NLRB v. Lord Baltimore Press, Inc.*, 370 F.2d 397, 402 (8th Cir. 1966). The *Hollywood Ceramics* standard includes consideration of such factors as whether there has been a misrepresentation of facts important in the election campaign, whether the party making the misrepresentation was in a position to have authoritative knowledge on the subject of the misrepresentation, whether the workers addressed had independent knowledge that would enable them to evaluate the misrepresentation and whether opposing parties had some opportunity to make an effective rebuttal. *See NLRB v. Allis-Chalmers Corp.*, 601 F.2d 870, 872 n.3 (5th Cir. 1979).

The most serious misrepresentation in this case involved a contract between the Union and Emerson Electric Company (hereinafter Emerson), which owned Van Gorp. The contract covered Emerson's Pittsburgh, Pennsylvania, plant known as the Wiegand plant. There was undisputed testimony before the Board that the Wiegand contract provided a cost of living adjustment (COLA) allowing a maximum of twelve cents pay increase each year for the three-year duration of the contract. However, on its face the wording of the Wiegand contract is confusing and ambiguous. *See* appendix. A Union official, taking advantage of the difficulty a lay person would have in understanding the contract, repeatedly attempted to convince workers that the Wiegand COLA was a maximum of twelve cents per quarter, rather than twelve cents per year.

Union representatives persisted in this misrepresentation in such a way that effective rebuttal would have been nearly impossible. Company officials repeatedly told workers that the Wiegand COLA was limited to a maximum of twelve cents per year. The day before the election at a mandatory meeting of all workers in the prospective bargaining unit, Van Gorp's vice president for labor relations offered a $500 reward to anyone who could prove false Van Gorp's assertion that the Wiegand COLA had a twelve cent annual maximum. That night at a voluntary Union meeting for members of the prospective bargaining unit, a Union representative replied that on the basis of the wording of the Wiegand contract itself, he could collect the $500 reward. He gave Union supporters copies of the contract to use in demonstrating to other workers that

standard enunciated by the Board in *Shopping Kart Food Market, Inc.*

**3.** Van Gorp also challenges the certification on grounds of improper conduct of the election and improper card solicitation by the Union. Because of our refusal to enforce the Board's order on other grounds, we do not reach these challenges.

the Wiegand maximum was twelve cents per quarter, not twelve cents per year. By using the confusing contract language in this way, the Union created a last minute misrepresentation that could not be effectively rebutted by Van Gorp.

The Board contends in this court that no misrepresentation of the Wiegand contract was made by Union officials. But, it is not at all clear that the Board made any such finding in its decision on the refusal to bargain. When Van Gorp objected on the basis of the Wiegand COLA misrepresentation to the certification of the Union, the Board's hearing officer recommended that the objection be rejected for two reasons: because he found no substantial departure from the truth *and* because he found that the employer had sufficient opportunity to respond to the alleged misrepresentation. The hearing officer's recommendation was adopted without further comment by the Board in certifying the Union as bargaining representative. In the proceedings involving Van Gorp's subsequent refusal to bargain, however, the Board reevaluated Van Gorp's objection concerning this misrepresentation and summarily declared the objection meritless without any hint whether this conclusion was based on a finding that the representation was true, or a finding that Van Gorp had sufficient opportunity to respond, or some other finding, *e. g.*, that the misrepresentation was not important enough to warrant overturning the election. *Van Gorp Corporation, supra*, 240 N.L.R.B. No. 86 (slip opinion at 5 n.2).

Assuming the Board, indeed, found that the Union official did not misrepresent the Wiegand contract by claiming it allowed twelve cents per quarter COLA, the Board's finding is not supported by substantial evidence. The record before the Board contained undisputed testimony that in fact

the Wiegand contract provided only a twelve cent per year COLA. The Union was a party to the Wiegand contract and in a position to have authoritative knowledge about how much the COLA actually was under that contract. Yet in the subsequent proceedings before the Board, the Union presented no evidence to refute Van Gorp's position that the COLA was only twelve cents annually.

The only support offered by the Board for a finding of no misrepresentation is that the Wiegand contract on its face is complex and confusing. This is not substantial evidence in a record which contains uncontradicted testimony demonstrating how the Wiegand contract in fact was interpreted. The confusing wording of the Wiegand contract does not support any finding that the Union's interpretation was correct or that the Union was not in a position to understand the actual meaning of the words. To the contrary, the confusing wording of the Wiegand contract made the Union's misrepresentations more insidious and more misleading to Van Gorp workers and made it nearly impossible for Van Gorp to respond effectively. As Van Gorp points out, workers would be likely to give special weight to a Union official's interpretation of the language of a collective bargaining agreement to which the Union is a party, especially when the Union official purports to back up his position with the language of the agreement. *See NLRB v. Millard Metal Service Center, Inc.*, 472 F.2d 647, 650 (1st Cir. 1973).[4]

The record in this case also compels the conclusion that misrepresentations relating to cost of living provisions were likely to affect the outcome of the election. Emerson had obtained ownership of Van Gorp in 1976, and at that time had eliminated a

---

4. We do not suggest that the kind of misrepresentation present in this case regarding pay rates will always compel invalidation of a representation election; other factors may compel a different conclusion. For example, there may be evidence of discussions sufficient to enable workers to evaluate the claims about pay rates, or other relevant circumstances. *See, e. g., NLRB v. Allis-Chalmers Co., supra*, 601 F.2d at

873–74. We do not attempt at this time to enumerate circumstances that would be relevant, but note only that this record is devoid of any evidence that would cause us to question that the cost of living misrepresentation deflected the process of choosing a bargaining representative sufficiently to make uncertain the will of the majority of Van Gorp workers.

quarterly cost of living adjustment that had previously been the practice at Van Gorp. (Testimony before the Board's hearing examiner suggested that the Emerson policy was to include cost of living considerations in once a year job valuation reviews.) There was undisputed testimony to the effect that many workers at Van Gorp were unhappy with their loss of quarterly cost of living adjustments; this testimony strongly suggests COLA was an important issue in the campaign.

Moreover, the disparity between a maximum COLA of twelve cents per year and twelve cents per quarter would amount to over a dollar an hour in pay by the third year of a contract. In a recent case involving misrepresentations relating to a comparable amount of money, we noted that

> [t]he representations challenged in this case go to what is perhaps the most crucial issue of any organization effort: whether the company is paying the bargaining unit employees as much as it would if the employees were represented by the union. While we make due allowance for some degree of "puffing" which any election contest engenders, we do not take the same view with respect to factual assertions made by either party to the contest. Promises are often written on the wind, but statements of fact are the stuff upon which men and women make serious value judgments. In the context of an election, rank and file employees must largely depend upon the company and the union to provide the data on which the arguments pro and con are based. If either side departs substantially from the truth, that side must accept the consequences if the misrepresentation, whether or not intended, could reasonably be expected to affect significantly the outcome of the election.

*J.I. Case Co. v. NLRB*, 555 F.2d 202, 205 (8th Cir. 1977) (citations omitted). *Cf. Nash Finch Co.*, 242 N.L.R.B. No. 198 (1979) (election tainted where union misrepresented that it had negotiated about ten cents per mile more for drivers already organized than the collective bargaining agreement covering those drivers actually provided).

## II.

Van Gorp also objected that coercive conduct by Union supporters made it impossible for employees to exercise free choice in the election. In fact, the hearing officer found that four separate incidents of coercion occurred. First, in early August, 1977, shortly after the Union filed a petition for a representation election, Terry Davis, a day shift employee who was apparently a Union supporter, threatened a night shift employee, Dennis Wares, that "there is likely to be some broken windows" in Wares' car if the night shift did not support the Union. Then, in mid-August, Union supporter Benny Faughan told employee Krestin Spriggs to help the Union's campaign, "or else." Third, in mid-September, Faughan told another employee, Vance Light, that if the night shift employees would not support the Union he would start breaking arms and putting screwdrivers through radiators.

The most serious incident occurred early in October, 1977, about two weeks prior to the election. Night shift employee Paul Schumacher, an open Union opponent, first was told by Davis that opposition to the Union would lead to "serious trouble." A few days later, while Schumacher was coming to work at about five o'clock, he was met at the time clock by Ray VanderLinden, a day shift Union supporter who was clocking out. As they argued, VanderLinden hit or shoved Schumacher and threatened to set fire to Schumacher's car or house or harm his family.[5] Schumacher reported the incident to his supervisors and left work early that day, upset by the incident.

---

5. There is some question as to whether any other employees witnessed this incident. Schumacher testified specifically that there were no other employees present. Terry Davis, however, testified that he and other employees had been present when VanderLinden and Schumacher argued at about five o'clock on some day in October, 1977, but that Davis did not see any physical contact.

The last of these incidents of coercion occurred more than two weeks before the election. It may also be significant that no incidents occurred subsequent to October 13, 1977, when Van Gorp posted a notice to repudiate widespread rumors in the plant that Van Gorp was planning to fire Union supporters if the Union lost the election. The hearing officer found that in fact these firing rumors started after foremen[6] told pro-Union employees that "heads would roll" if the Union lost. (The hearing officer also found that Van Gorp officials also kept a list of employee's Union preferences.) Although Van Gorp argues that its posted notice disclaiming the rumors should exonerate it from all responsibility,[7] conduct of foremen cannot be disregarded in examining the totality of circumstances in which the election took place.

By examining each incident of coercion independently from the rest, the hearing officer concluded that the threats amounted to no more than "tough talk" which might not have been taken seriously and that there was no specific evidence that any votes were changed. The decision treated the assault as relatively insignificant, in part because Van Gorp did not report the incident to the police or take disciplinary action against VanderLinden or lodge a complaint with the Union or the Board.

The record taken as a whole simply does not support the conclusion that the threats were not taken seriously and the conclusion cannot stand. The record shows that there was an escalating series of threats culminating in an incident of violence. Moreover, proof that particular votes were changed is not required in challenging an election on the basis of coercive behavior. "[R]epresentation elections will be set aside

where . . . conduct is shown to have created 'an atmosphere of fear and reprisal such as to render a free expression of choice impossible.'" *NLRB v. Griffith Oldsmobile, Inc.*, 455 F.2d 867 (8th Cir. 1972), *citing Manning, Maxwell & Moore, Inc. v. NLRB*, 324 F.2d 857, 858 (5th Cir. 1963). *Cf. Fidelity Telephone Co. v. NLRB*, 574 F.2d 409 (8th Cir. 1978). Under this standard the conduct of the Union's supporters obviously raises serious questions.

If the election were challenged only on the basis of the coercive incidents in this record, this case would present a difficult question. *Compare NLRB v. Urban Telephone Corp.*, 499 F.2d 239 (7th Cir. 1974) (election invalid), *with NLRB v. Southern Paper Box Co.*, 506 F.2d 581 (8th Cir. 1974) (election valid). A case like this, where the record discloses improprieties on both sides, involves especially sensitive problems which the Board did not address. Of course, setting the election aside where both sides have engaged in coercive activities may seem to favor the side that lost the election. It also may tempt a party which anticipates losing an election to use improper tactics in an effort to provoke the other side into retaliating. But toleration of even minimal violence or threats of violence in a heated campaign may well provide the kindling for a serious conflagration.

Van Gorp urges that we should attach more seriousness to the coercive behavior in this case, because the Union supporters as an informal in-house organizing committee had at least apparent authority to act for the Union. *See NLRB v. Georgetown Dress Corp.*, 537 F.2d 1239 (4th Cir. 1976); RESTATEMENT (SECOND) OF AGENCY §§ 27, 216 & 265 and Comment on subsection (1) of § 265 (1958). (The Board main-

---

**6.** Van Gorp advises us that the two foremen left its work force to go into business for themselves during the election campaign.

**7.** Van Gorp inappropriately relies on the decision in *NLRB v. Intertherm Corp.*, 596 F.2d 267, 276–77 (8th Cir. 1979). In that case a supervisor had coercively polled employees during an election campaign as to whether the employees preferred a union. The company posted a notice not only explaining the incident and giving

assurances that such coercion would not recur, but also reporting that the supervisor had been reprimanded and affirmatively assuring employees of their rights under the NLRA. This full retraction, which was held to remedy a single incident of coercion, is hardly comparable to the weak statement posted by Van Gorp which did little more than deny that Van Gorp would carry out any threat of unlawful retaliation.

tains that the Union supporters had no authority, apparent or real, despite their activities on the Union's behalf, such as passing out literature, signing up members and promoting the Union. *Cf. Owens-Corning Fiberglas Corp.,* 179 N.L.R.B. 219, 223 (1969), *enforced,* 435 F.2d 960 (4th Cir. 1970).) We note that Van Gorp does not include among those alleged to be Union agents Terry Davis, who was the active participant in two of the four incidents. Therefore at most the conduct at issue was only partly attributable to the Union. Moreover, this is not a case in which someone threatened to use the Union's powers against opponents, a kind of threat that clearly is more serious when coming from a Union agent. *See, e. g., NLRB v. Georgetown Dress Corp., supra,* 537 F.2d at 1241. Indeed this kind of threat of physical violence might be most serious when made by a third party not subject to regulation by the Board, *see NLRB v. Payless Cashway Lumber Store, Inc.,* 508 F.2d 24 (8th Cir. 1974), or when made anonymously, *but cf. NLRB v. Griffith Oldsmobile, supra,* 455 F.2d at 869–71 (election valid despite anonymous threats). *See generally* SECTION OF LABOR RELATIONS LAW, A.B.A., THE DEVELOPING LABOR LAW 106 (1971); *Id.,* CUMULATIVE SUPPLEMENT 1971–1975 (1976) at 48. *But see NLRB v. Urban Telephone Company, supra,* 499 F.2d at 242–43.

### III.

We cannot close our eyes to the cumulative effect of the serious last minute misrepresentation by the Union and the coercive conduct of Union supporters. We review the Board's decision in light of the record as a whole. 29 U.S.C. § 160(e). "[I]t is the totality of the circumstances in any particular case that determines whether a free and fair election was held." *Sonoco Products Co. v. NLRB,* 399 F.2d 835, 843 (9th Cir. 1968). *See also Audiovox West Corp.,* 234 N.L.R.B. 428, 431 (1978).

■ The hearing officer's decision approved by the Board in this case has two flaws: it does not adequately address the serious misrepresentation of wage rates by the Union, and it fails to consider the cumulative effect of coercive conduct by Union supporters along with the Union's misrepresentation. While, of course, the Board must carefully examine each separate alleged impropriety which may tend to influence the election, the goal of this inquiry is to determine whether employees had an opportunity to exercise free and fair choice of bargaining representative. *NLRB v. Savair Manufacturing Co.,* 414 U.S. 270, 276, 94 S.Ct. 495, 498, 38 L.Ed.2d 495 (1973). Consideration of each alleged impropriety isolated from the overall course of an election campaign will not always answer the question.

While we emphasize the need to consider the overall conduct of an election campaign, we caution that such an approach may not be used to turn a number of insubstantial objections to an election into a serious challenge. *See NLRB v. Southern Paper Box Co., supra,* 506 F.2d 581. As our approach in this case indicates, we think a conclusion concerning the overall conduct of the campaign is the end and not the beginning of the inquiry. We look to the cumulative effect only because, considering the misrepresentation and coercion independently, each is serious enough to raise doubts whether the election was an expression of employee free choice. We are not substituting a vague standard of general fairness for the Board's judgment, but rather applying the Board's well established standards to evaluate election improprieties, without losing sight of the basic statutory purpose to insure that employees may obtain bargaining representatives of their own choosing. *NLRB v. Savair Manufacturing Co., supra,* 414 U.S. at 276, 94 S.Ct. at 498.

■ As the Board points out, the employer has a "heavy burden" in a case like this where it seeks to set aside a misrepresentation election approved by the Board. *NLRB v. Griffith Oldsmobile, Inc., supra,* 455 F.2d at 871. The record in this case contains uncontradicted evidence that cost of living adjustments were a major issue in the misrepresentation campaign, that the

Union substantially misrepresented cost of living provisions in another collective bargaining agreement between the Union and the employer and that the misrepresentations were made the night before the election in a way that made it virtually impossible for the employer to answer effectively. The record also discloses clearly coercive conduct on the part of Union supporters. At a minimum three employees were directly threatened and a fourth was assaulted.

This course of conduct during the election campaign must be evaluated in light of the closeness of the outcome. *NLRB v. Skelly Oil Co.*, 473 F.2d 1079, 1085 (8th Cir. 1973). The Union prevailed by a five vote margin; therefore, a change of three votes would have reversed the result. We think that the employer has met the heavy burden of showing that this election took place in an atmosphere so hostile to employee free choice that we must reject the Board's certification of the Union and refuse to enforce the bargaining order.

Accordingly, the Board's petition for enforcement is denied.

## APPENDIX

The Wiegand contract provided:

ARTICLE 43—COST OF LIVING:

(a) There will be added to each employee's hourly earnings a Cost of Living Allowance (hereinafter termed Allowance and meaning the total Cost of Living adjustment payable), in accordance with the following formula:

(b) The Cost of Living Allowance will be determined in accordance with changes in the official Consumer Price Index-U. S. City Average for Urban Wage Earners and Clerical Workers (including single workers) published by the Bureau of Labor Statistics, U. S. Department of Labor (1957–59 equals 100) and hereinafter referred to as the "B.L.S. Consumer Price Index".

(c) Adjustments in the Cost of Living Allowance will be made quarterly at the following times:

| Effective Date of Adjustment | Based on B.L.S. Consumer Price Index |
|---|---|
| On or after Jan. 1 | November |
| On or after April 1 | February |
| On or after July 1 | May |
| On or after October 1 | August |

In no event will a decline in the B.L.S. Consumer Price Index below 176.7, September, 1974 provide a basis for a reduction in wage rates.

The amount of the Cost of Living Allowance which shall be effective for any quarter as provided in Paragraph (c) of this section shall be determined as follows:

(1) For the four calendar quarters commencing on or after January 1, 1975 quarter, an amount equal to .01c for each full 0.040 that the index upon which the allowance is based exceeds 176.7, but in no event shall the allowance for any such quarter exceed .12.

There is to be a yearly Cost of Living Guarantee of .12/hour. If the Cost of Living increases during the year do not total .12 there shall be a special Cost of Living Supplementary Adjustment to make up the difference. The Supplementary Adjustment will become effective October 31, 1975 and will in no way affect whatever Cost of Living adjustment is due on January 1, 1976.

(2) For each of the next four succeeding quarters commencing with January, 1976 * an amount equal to 1c for each full 0.040 that the index upon which the Allowance is based exceeds the index for the previous September, but in no event shall the Allowance for any such quarter exceed .12 plus the cumulative total of the Allowance in effect during the October, 1975 quarter.

There is to be a yearly Cost of Living guarantee of .12/hour. If the Cost of Living increase during the year do not total .12 there shall be a special Cost of Living Supplementary Adjustment to make up the difference. The Supplementary Adjustment will become effective October 31, 1976 and will in no way affect whatever Cost of Living adjustment is due January 1, 1977.

* —quarter [sic]

(3) For each of the next four succeeding quarters commencing with the January, 1977 quarter during the term of this agreement, an amount equal to 1c for each full 0.040 that the index upon which the allowance is based exceeds the index for the previous September (but in no event shall the Allowance for any such quarter exceed .12 plus the cumulative total of the Allowance in effect during the October, 1975 and the October, 1976 quarters).

There is to be a yearly Cost of Living guarantee of .12/hour. If the Cost of Living increases during the year do not total .12 there shall be a special Cost of Living Supplementary Adjustment to make up the difference. The Supplementary Adjustment will become effective October 31, 1977.

Provided that the sum of any quarterly Allowance plus the cumulative total of the Allowances in effect during any of the four quarters starting with the January, 1977 quarter shall but exceed .36 and provided further that the Allowance in all quarters commencing with the January quarter, 1975 and continuing through the July quarter, 1977 shall be adjusted in conformance with the following:

| | |
|---|---|
| 176.7–177.0 | None |
| 177.1–177.4 | 1c |
| 177.5–177.8 | 2c |
| 177.9–178.2 | 3c |
| 178.3–178.6 | 4c |
| 178.7–179.0 | 5c |
| 179.1–179.4 | 6c |
| 179.5–179.8 | 7c |
| 179.9–180.2 | 8c |
| 180.3–180.6 | 9c |
| 180.7–181.0 | 10c |
| 181.1–181.4 | 11c |
| 181.5–181.8 | 12c |
| 181.9–182.2 | 13c |
| 182.3–182.6 | 14c |
| 182.7–183.0 | 15c |
| 183.1–183.4 | 16c |
| 183.5–183.8 | 17c |
| 183.9–184.2 | 18c |
| 184.3–184.6 | 19c |
| 184.7–185.0 | 20c |
| 185.1–185.4 | 21c |
| 185.5–185.8 | 22c |
| 185.9–186.2 | 23c |
| 186.3–186.6 | 24c |
| 186.7–187.0 | 25c |
| 187.1–187.4 | 26c |
| 187.5–187.8 | 27c |
| 187.9–188.2 | 28c |
| 188.3–188.6 | 29c |
| 188.7–190.0 | 30c |
| 190.1–190.4 | 31c |
| 190.5–190.8 | 32c |
| 190.9–191.2 | 33c |
| 191.3–191.6 | 34c |
| 191.7–192.0 | 35c |
| 192.1–192.4 | 36c |

(3) One penny of the Cost of Living payable in each quarter between January, 1975 and October, 1977—a maximum total of .02 in each year of the contract to a maximum of .06 to be diverted to help pay for Dental Care and the new fringe benefits.