NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

AMOCO CHEMICALS
CORPORATION,
Respondent.

No. 74–3050.

United States Court of Appeals,
Fifth Circuit.

March 25, 1976.

428

Elliott Moore, Deputy Associate Gen. Counsel, James L. Kestell, Atty., N. L. R. B., Washington, D. C., Louis V. Baldovin, Jr., Director, Region 23, N. L. R. B., Houston, Tex., for petitioner.

James A. Sullivan, III, Standard Oil Co. (Indiana), William H. Emerson, Chicago, Ill., for respondent.

Before WISDOM, CLARK and RONEY, Circuit Judges.

CLARK, Circuit Judge:

This is a petition by the National Labor Relations Board (the Board) for enforcement of its order against Amoco Chemical Corporation (Amoco or the Company). Substantially affirming the findings and conclusions of the Administrative Law Judge, the Board found that Amoco violated § 8(a)(1) of the National Labor Relations Act (the Act), 29 U.S.C. § 151 et seq., by threatening an employee with loss of benefits in reprisal for voting in favor of union representation.

Additional § 8(a)(5) and derivative § 8(a)(1) violations were assessed for the Company's action in unilaterally reducing the hours of work of its employees and unilaterally adopting a disciplinary warning system. To remedy these unfair labor practices, the Board issued its usual cease and desist order, ordered Amoco to remove disciplinary letters from employees' personnel files and affirmatively required the Company to make whole those employees who suffered a loss of wages as a result of Amoco's reduction of employee work hours.

A review of the record as a whole fails to reveal substantial evidence to support the § 8(a)(1) violation and thus we refuse to enforce that portion of the Board's order. Although the § 8(a)(5) violations find adequate support in the record, the appropriateness of the Board's backpay order is not demonstrated by the evidence adduced. Accordingly, we remand for the limited purpose of allowing the Board to determine whether the record should be supplemented to make such showing.

## I. BACKGROUND FACTS

On April 27, 1973, the employees of Amoco's truck transport terminal in Texas City, Texas selected Local 4–449, Oil, Chemical & Atomic Workers International Union (the Union) as their bargaining representative. The Texas City terminal had been in existence since January, 1972, as part of Amoco's proprietary trucking operation consisting of five terminals located across the country. The terminal was engaged in providing trucking services for three Amoco manufacturing plants—two at Texas City and the Chocolate Bayou plant at Alvin, Texas. Terminal employees hauled supplies and materials to and between the plants, and transported Amoco products to warehouses, customers and shippers.

The business of the terminal was highly irregular. From month to month, hauling of various product lines was never constant. Certain products were discontinued and it frequently became necessary to procure substitutions. The number of trips per product per month could not be predicted with any certainty. The drivers were paid on the time/mileage basis subject to a monthly guarantee of 700 dollars.

Although the terminal employees were supervised directly by a truck transport supervisor in Texas City, management officials from Amoco's Chicago headquarters had primary responsibility for formulating Company policy. During its life span, the Texas City terminal employed three successive terminal supervisors. Russell Williams, Manager of Proprietary Trucking and William Justiss, Truck Transport Supervisor, were the Chicago officials most involved in the post-election events at the Texas City terminal.

In preparation for bargaining, a union representative requested copies of the drivers' work schedules from both the terminal supervisor and the Company. He was told that no such schedules were available. The only bargaining session between the parties was held on June 21, 1973. The discussion was confined to the proposed collective bargaining agreement. Amoco was not willing to discuss the problems at the Texas City Terminal because of pending Board proceedings.

On August 10, 1973, the Texas City terminal closed for economic reasons. The Board does not question the legality of this action. Rather, three actions taken by the Company in the interim between the April election and the August closing form the basis of the unfair labor charges against it.

## II. POST–ELECTION STATEMENTS

On the first working day following the election, Truck Transport Supervisor Justiss approached employee Richard Montayne, the terminal's sole mechanic, and stated that, "it looks like you fellows have voted yourself a cut in pay." That same day, Justiss asked a driver what he thought about the election. After receiving the driver's noncommittal response, Justiss remarked, "it might not be too bad on drivers, but poor old Dick

[Montayne] voted himself a cut in pay." Three days later, Justiss showed Montayne a piece of paper purportedly containing Union wage classifications, and pointed to the item listing mechanics' pay at $2.85 per hour. Montayne replied that if mechanics at that plant worked for $2.85 per hour, they were not qualified, decent mechanics, since no qualified mechanic would work for that kind of money. The next day, Montayne was summoned to the terminal supervisor's office. There Justiss notified Montayne that he did not want Montayne putting in overtime any more and that pursuant to the Company's new set of rules, no one would be working more than 40 hours a week. Throughout this period, Montayne was a salaried employee receiving 800 dollars per month.

Only Justiss' first "cut in pay" statement to Montayne was alleged in the General Counsel's complaint as a violation of § 8(a)(1). The Administrative Law Judge found the Company's post-election statement coercive in nature, constituting an implied threat of reprisal against the employees for their decision to unionize the terminal. The judge reasoned that while the statement, by itself, might appear to be isolated, the fact that it was accompanied by conduct constituting an unlawful refusal to bargain necessitated the issuance of a remedial order. The Board adopted the findings of the Administrative Law Judge on this charge without comment. Member Kennedy dissented, classifying the statement as isolated and not worthy of a remedial order.

■ In this enforcement proceeding, our review is limited to the question of whether there is substantial evidence on the record as a whole to support the Board's findings. Section 10(e), 29 U.S.C. § 160(e); *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). With respect to coercive speech violations, an appellate court must recognize "the Board's competence in the first instance to judge the impact of utterances made in the context of the employer-employee relationship." *NLRB*

*v. Gissel Packing Co.,* 395 U.S. 575, 620, 89 S.Ct. 1918, 1943, 23 L.Ed.2d 547, 581 (1969). Applying this narrow review standard, we are unable to agree with the Board's finding that Justiss' post-election statement to Montayne constituted a threat of reprisal violative of § 8(a)(1).

■ On its face, Justiss' conversation with Montayne was innocuous. The only reasonable construction of the Amoco supervisor's "cut in pay" remark was that the Union now representing Montayne possessed a lower regard for the worth of mechanics than did the Company. Neither the words used nor any other evidence indicates that Amoco intended to communicate any implication that Montayne's monthly salary would be lowered unilaterally. Neither does the record show that Montayne felt intimidated by the supervisor's remarks or viewed them as a warning to discontinue support for the Union. Most importantly, the alleged violation took place only after the Union won the election. In this context, there is less danger that an employer's facially non-coercive statements are intended as threats than might be attributable to pre-election comments.

The case at bar can be easily distinguished from the two post-election § 8(a)(1) cases cited by the Board. In *Armstrong Cork Co. v. NLRB,* 211 F.2d 843 (5th Cir. 1954), an employer announced to an assembly of workers shortly after a representation election that he intended to remove a "pledge" which the Company had posted on the bulletin board setting forth employees' rights. This symbolic threat was swiftly carried out and was accompanied by a cancellation of proposed wage increases to represented employees. The Company's retaliatory posture had been foreshadowed by a pre-election warning to an employee which in effect threatened a withdrawal of the pay raise if the Union won. Similarly, in *NLRB v. McCann Steel Co.,* 448 F.2d 277 (6th Cir. 1971), the employer's coercive post-election remark ("there goes the Christmas bonus")

was accompanied by an actual withdrawal of benefits and was presaged by pre-election threats. In upholding the Board's § 8(a)(1) determination, the court in *McCann* expressly found the remark to be *de minimis*, but refused to review it independently because of the employer's other § 8(a)(1) transgressions. *Id.* at 279.

■ In contrast to the events described in *Armstrong* and *McCann*, the Board in the case now before the court did not find that Amoco was engaged in a campaign of retaliation against the workers. Although the Company committed § 8(a)(5) violations, such action did not serve to transform the employer's otherwise non-coercive statements into threats motivated by employer anti-union animus. *Cf. NLRB v. Sachs,* 503 F.2d 1229, 1235 (7th Cir. 1974). In this post-election context, Justiss'· remarks were no more than isolated statements not designed to coerce employees in their exercise of § 7 rights. We thus refuse to enforce the Board's order in this respect.

## III. WRITTEN REPRIMANDS

Shortly after the election, the Company started issuing written reprimands to its drivers for alleged infractions of company rules and regulations. During the months of May and June of 1973, a total of 24 warning letters were received by terminal employees and placed in their permanent personnel files. Usually the reprimands were issued in the first instance by the terminal supervisor, with a follow-up letter from the Chicago headquarters sent soon thereafter. This formalized system contrasted sharply with Amoco's informal oral warning procedure in operation for almost a year prior to the election. In finding a § 8(a)(5) violation, the Administrative Law Judge concluded that the disciplinary system constituted a change in the employees' terms and conditions of employment, unilaterally instituted by Amoco in retaliation for the workers' selection of the Union. In so doing, the judge refused to credit the Company's contention that the system was merely a resumption of a prior company policy which had been irregularly enforced due to the turn-over in terminal supervisors. The Board agreed that Amoco's unilateral action was violative of § 8(a)(5), but expressly refused to find that the Company's action was motivated by anti-union animus, since that theory had not been litigated by the parties. Again Member Kennedy dissented, arguing that the system was not an innovation and, in the alternative, that the procedure did not constitute a structured disciplinary system and thus fell within the scope of management prerogative.

■ There is substantial evidence to support the Board's findings that Amoco's written reprimand disciplinary system constituted a significant change in the terminal employees' working conditions. Prior to the election, only a few employees had ever received written warnings and for almost a year preceding the Union vote, no letters had been issued. It was thus reasonable for the Administrative Law Judge and the Board to regard the formal letter practice as an innovation. *See Murphy Diesel Co. v. NLRB,* 454 F.2d 303 (7th Cir. 1971). Moreover, the change was correctly classified by the Board as involving a mandatory subject of collective bargaining. Under the new system, the employer's complaints tended to become a permanent part of an employee's personnel file which could affect his future job security. This court has recognized that internal plant rules and the enforcement procedures associated with such rules often fall within the scope of mandatory bargaining. *NLRB v. Gulf Power Co.,* 384 F.2d 822 (5th Cir. 1967) (safety rules). We find no reason for disturbing the Board's determination that Amoco's institution of more severe disciplinary procedures required prior notification and consultation with the newly elected Union. *See Colonial Press Inc.,* 204 N.L.R.B. 852 (1973).

## IV. REDUCTION OF WORKING HOURS

Almost immediately following the election, Amoco's Proprietary Trucking

Manager Williams instructed his assistant Justiss "to get the terminal back on a 40-hour [week] and no more than 5 hours overtime." At about the same time, the Company's hauling business began to decline drastically until it was forced to close down permanently in August. As a result, the driver's actual earnings progressively decreased, although they continued to collect their 700 dollar per month guarantee until the terminal shut down.

The Administrative Law Judge found that the Company's failure to consult the Union regarding its decision to reduce employee work hours constituted a refusal to bargain and ordered Amoco to make whole those employees who suffered a loss in wages as a result of the Company's unilateral action. The Board agreed with both the finding of the violation and the proposed remedy. In his dissent to the Board's order, Member Kennedy characterized the Company's action as "at most a technical violation" and concluded that a monetary remedy was unjustified since the decline in earnings was caused by economic conditions and not a failure to bargain.

 There can be no dispute that Amoco unilaterally reduced employee hours without attempting to confer or negotiate with the Union. Manager Williams testified that he instructed both Mr. Justiss and the terminal supervisor to get the Texas City terminal back to a 40-hour week. Such reduction necessarily affected the drivers' wages and must be classified as a unilateral change in the employees' working conditions subject to mandatory collective bargaining under § 8(a)(5). Neither Amoco's good faith nor its claim of economic justification can excuse its refusal to bargain concerning the decrease in hours. *NLRB v. Katz,* 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962). Thus a § 8(a)(5) violation was properly assessed against Amoco for its unilateral action.

 However, on the record before us, we are unable to conclude that a monetary award was an appropriate device to remedy Amoco's failure to bargain about a reduction in work hours. Neither the Administrative Law Judge nor the Board made findings sufficient to demonstrate that the employees suffered any economic loss as a result of Amoco's failure to consult the Union before acting. The opinion of the Administrative Law Judge did not attempt to ascribe particular events as the causes of the drastic decline in the business of the terminal. Nor were any findings made relative to the details surrounding Amoco's decision to curtail hours. In contrast to the allegations made in the Board's appellate brief, no findings were made which tended to show that Amoco was responsible for the closing of the terminal. Rather the evidence suggests and the Board does not contest that the demise of the terminal came about as a result of external economic conditions. On the present record it is hard to perceive how bargaining would have altered the result or ameliorated the employees' loss. *See Wonder State Manufacturing Co.,* 144 N.L.R.B. 179, 181 (1964).

 The Board suggests that had bargaining not been pre-empted by the employer's unilateral action, the Union could have agreed to "layoffs or transfers to other operations of the parent corporation, or to implement some other proposal" and states that the innocent employees should not be made to suffer from speculation of what might have happened. It is clear that the Company had a duty to bargain concerning the effects of the phase out of operations at the terminal. *See NLRB v. Winn-Dixie Stores, Inc.,* 361 F.2d 512 (5th Cir.), *cert. denied,* 385 U.S. 935, 87 S.Ct. 295, 17 L.Ed.2d 215 (1966). Negotiations could have produced several possible solutions. Under one, the Union could have insisted that the available work be spread out less evenly, preferring to have senior drivers benefit at the expense of the newer employees. Another equally plausible negotiation could produce the very across-the-board reduction which actually resulted. However, for this court to engage in any such "reconstruction" of events to approve what the Board may

order is to compound speculation. Without a more complete factual foundation than this record now offers, the Board may not infer a loss and thereby justify its decision to award back pay. In *Regal Knitware Co. v. NLRB,* 324 U.S. 9, 13, 65 S.Ct. 478, 481, 89 L.Ed. 661, 666 (1945) the United States Supreme Court stated that:

Administrative agencies have considerable latitude to shape their remedies within the scope of their statutory authority and, where the infirmity is an inadequacy of findings to show appropriateness of the choice made in the particular case, are ordinarily entitled to have the case remanded for further consideration.

In the recent case of *Armstrong Rubber Co. v. NLRB,* 511 F.2d 741 (5th Cir. 1975), this court remanded a proceeding to the Board to permit that agency to make necessary findings attendant to reinstatement and backpay orders. That course is also appropriate here. We therefore decline to enforce the make-whole remedy ordered by the Board and remand for further proceedings within the Board's discretion designed to supplement the record to supply the necessary evidentiary basis for a monetary award.

Enforced in part, remanded in part.