WINN–DIXIE STORES, INC.,
Petitioner-Cross Respondent,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent-Cross
Petitioner.

AMALGAMATED MEAT CUTTERS AND
BUTCHER WORKMEN OF NORTH
AMERICA, AFL–CIO, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

Nos. 76–2733 and 76–3558.

United States Court of Appeals,
Fifth Circuit.

Feb. 17, 1978.

Charles F. Henley, Jr., William H. Andrews, Jacksonville, Fla., for Winn-Dixie Stores, Inc.

Elliott Moore, Deputy Associate Gen. Counsel, William R. Stewart, David F. Zorensky, John S. Irving, John E. Higgins, Jr., Carl L. Taylor, N.L.R.B., Washington, D. C., for N.L.R.B.

Linda R. Hirshman, Robert S. Sugarman, Joseph M. Jacobs, Chicago, Ill., for Amalgamated Meat Cutters & Butcher Workmen of North America, AFL–CIO.

Harold A. Boire, Reg. Director, Region 12, N.L.R.B., Tampa, Fla., for other interested parties.

Before WISDOM and GEE, Circuit Judges, and VAN PELT *, District Judge.

GEE, Circuit Judge:

In No. 76–2733, Winn-Dixie Stores, Inc. ("Winn-Dixie" or "the company") petitions this court for review of an order of the National Labor Relations Board ("the Board"), and the Board cross-applies for enforcement of its order. In No. 76–3558, Amalgamated Meat Cutters and Butcher Workmen of North America, AFL–CIO ("the union") petitions this court for review of the same Board order. Winn-Dixie has intervened in No. 76–3558; the union has intervened in No. 76–2733.

Winn-Dixie, a Florida corporation with headquarters in Jacksonville, operates a chain of supermarkets throughout the southeastern United States. It has a history of labor controversies and has appeared before the Board and this court several times.[1] The issues involved in this case arise out of incidents taking place in the company's Jacksonville warehouse during the period from 1969 to 1973.

The Board found that Winn-Dixie had violated section 8(a)(3), (5) and (1). of the National Labor Relations Act ("the Act"), 29 U.S.C. § 158(a)(3), (5) and (1), by committing the following acts: (1) maintaining a profitsharing/retirement plan which by its terms precluded coverage of employees who were covered by a pension plan as a result of collective bargaining; (2) refusing to bargain over the possibility of unionized employees getting coverage under both the company's profitsharing/retirement plan and a union-proposed pension plan; and (3) unilaterally increasing insurance benefits and wages.[2] The Board ordered the company to post notices of the Board's action in all the warehouses in the Jacksonville division, to mail a copy of the notice to each

employee, to read the notice aloud to the employees, and to grant the union access to bulletin boards for one year. The Board also ordered two forms of monetary relief: (1) with respect to the company's profitsharing/retirement plan, the company must reinstate the funds in the accounts forfeited by employees as a result of the 1970 collective bargaining agreement, open accounts for those employees who would have become eligible for the company plan since 1970, and contribute the funds that should have gone into those accounts including annual payments of up to $300 for those employees eligible for such benefits; and (2) the company must make the unit employees whole for any losses they may have suffered as a result of the company's unfair labor practices by compensating employees for any differences in benefits which exist between the Jacksonville warehouse and another comparable warehouse in the Winn-Dixie system.[3]

The company contests all aspects of the Board's findings and order described above. The union complains of the Board's failure to find additional unfair labor practices and the Board's refusal to award litigation expenses and excess organization expenses.

### The Profitsharing Plan

At all times relevant to the issues in this case, Winn-Dixie has administered a profitsharing plan for its employees. Participation in the plan is voluntary. In order to be eligible for participation an employee must be at least twenty-one years old and have at least five years of continuous employment with the company. Each participating employee is given a separate account to which the company makes annual contributions on the basis of a certain percentage of the company's profits for that year.

---

* Senior District Judge of the District of Nebraska, sitting by designation.

1. See, e. g., *Winn-Dixie Stores, Inc.*, 166 N.L.R.B. 227, enf'd per curiam, 414 F.2d 786 (5th Cir. 1969); *In re Winn-Dixie Stores, Inc.*, 386 F.2d 309 (5th Cir. 1967) (criminal contempt); *Winn-Dixie Stores, Inc.*, 138 N.L.R.B. 1355, enf'd per curiam, 324 F.2d 502 (5th Cir. 1963).

2. The Board also found Winn-Dixie guilty of other unfair labor practices, but Winn-Dixie does not challenge those findings.

3. The Board ordered certain other remedies, but the company does not challenge them here.

Under the plan employees or their heirs become entitled to payment from their accounts upon retirement, death, or termination of employment with the company for reasons other than theft or other conduct detrimental to the company. In addition, the plan provides for annual cash payments of up to $300 for eligible employees who earn under $8,500 per year. All of the unionized employees in the Jacksonville warehouse earned less than this amount.

Until it was amended in 1971, the company's plan contained a provision, Article II, Section 2.4(b), which excluded from participation in the plan:

Employees who as a result of collective bargaining have entered into a written agreement by which Employer agrees to contribute funds for the benefit of such employees to some form of retirement program.

Thus, by its terms the company plan precluded the possibility that the unit employees could be covered simultaneously by the company plan and a pension plan proposed by the union.[4]

The company's position at the bargaining table was that such "double coverage" was not a negotiable matter. The ALJ found no violation in the existence of the clause or in the company's adamant refusal to bargain over dual coverage. The ALJ reasoned that since the company plan was really a retirement or pension plan, the company could rightfully refuse to bargain over simultaneous coverage under two pension plans.

The Board reversed the ALJ on the grounds that the company plan was funded by a percentage of company profits and thus differed from the standard pension plan under which an employee can be sure that his or her account will increase by a set amount every year. According to the Board, the fact that the company's profit-

sharing plan provided for disbursal of benefits at a time normally associated with retirement plans did not change the basic nature of the company's plan. In the alternative, the Board found that even if the company's plan was a pension plan, it included one provision not usually associated with retirement plans, *viz*, eligible employees earning less than $8,500 per year were entitled to receive up to $300 per year in cash payments. Thus, the company's plan was in part a profitsharing plan providing for annual cash bonuses.

In its brief the Board cites *Kroger Co. v. NLRB*, 401 F.2d 682 (6th Cir. 1968), *cert. denied*, 395 U.S. 904, 89 S.Ct. 1743, 23 L.Ed.2d 217 (1969), for the proposition that a company cannot exclude from participation in a profitsharing plan those employees who acquire a pension plan as a result of collective bargaining. Kroger maintained both a profitsharing plan and a retirement plan. The Sixth Circuit held that the exclusionary clause in the profitsharing plan, the only company plan at issue in that case, and Kroger's refusal to bargain over coverage of the unionized employees under both the union pension plan and the company profitsharing plan violated section 8(a)(5) and (1) of the Act.

Winn-Dixie would distinguish *Kroger* on the ground that Kroger had two plans, i. e., one a profitsharing plan and the other a retirement plan. The exclusionary clause in the profitsharing plan could not be supported by any "double coverage" argument since Kroger's profitsharing plan was in no sense a retirement plan. Exclusion of the unionized employees from Kroger's plans left them with only the union-proposed pension plan, while the remaining employees had both a pension plan and a profitsharing plan.

Here Winn-Dixie maintains one plan which incorporates both profitsharing and retirement aspects. Thus, we are presented

---

4. In 1971 the company amended the clause to exclude only those:

Employees who, as a result of collective bargaining, have entered into a written agreement with the Employer by which the Employer has agreed to contribute funds for

the benefit of such employees to some form of Pension or Retirement Program (other than "Program" herein) and *who have been excluded from this Program by agreement of the parties.*
(Emphasis added.)

with a more complex situation than was the Sixth Circuit in *Kroger*.

Without attempting to discern the "basic nature" of the Winn-Dixie plan and without deciding whether a company may refuse to bargain over exact duplication of benefits, we believe that Winn-Dixie's position violated its statutory duty to bargain. Even assuming that there is no duty to bargain over duplicate benefits, a company's duty to bargain becomes more and more clear as the differences in the two plans become greater. If this were not the case, a company could avoid the effect of *Kroger* by merely consolidating a pension plan and a profitsharing plan into one combined plan.

▪ Here the differences between the company plan and the union plan are sufficient to give rise to a duty to bargain over coverage under both plans. The company plan is funded by contributions directly related to company profits for a given year. The union plan is funded by fixed contributions which do not vary from year to year with the successes or failures of the company. The company's plan is voluntary; the union's plan is not. An employee becomes eligible under the company plan after five years; under the union plan an employee becomes eligible after sixty days. The company plan provides for cash payments of up to $300 per year. There can be no doubt that the prospect of annual payments in such an amount would be of great interest to the unionized employees, all of whom earned less than $8,500 per year. We therefore conclude that there is substantial evidence to support the Board's finding that the existence of the original clause 2.4(b) violated section 8(a)(3) of the Act, and the company's refusal to bargain over coverage under both plans violated section 8(a)(5) and (1) of the Act.

▪ The Board also held that the company's insistence that eligible employees forfeit their existing accounts under the company plan violated section 8(a)(5) and (1) of the Act and that the company's actual forfeiture of these employees' interests violated section 8(a)(3) of the Act. According to the Board, the fact that the existence of

clause 2.4(b) and the company's refusal to bargain over "double coverage" are violations dictates that insistence on forfeiture and actual forfeiture were likewise violations. We fail to discern the necessary connection and refuse to enforce this aspect of the Board's order because it is not supported by substantial evidence.

Apparently the first mention of forfeiture came after the union requested the wage increases included in a contract which Winn-Dixie had recently entered with the Teamsters Union in New Orleans. Prior to this time the company and the union had been bargaining on a provision-by-provision basis. The company told the union that it could have the New Orleans contract but only if it was willing to take it *in toto*. That contract provided for the creation of a union pension plan and for forfeiture of any existing accounts under the company profitsharing/retirement plan.

The union negotiators expressed a willingness to accept the entire New Orleans contract except for the forfeiture provision. The company insisted that the union take the whole contract or else the parties would have to go back to provision-by-provision bargaining. The union then agreed to the entire contract, subject to ratification by the employees.

▪ We refuse to hold that a company's insistence that a union accept a package proposal or else go back to piecemeal negotiations constitutes a violation of that company's duty to bargain in good faith. We also refuse to hold that the actual forfeiture constitutes discrimination as that term is used in section 8(a)(3) of the Act. Section 8(a)(3) prohibits discrimination among employees by an employer in such a manner as to encourage or discourage membership in any labor organization.

It is true that in some sense causing those employees with existing accounts to forfeit the funds already accumulated in those accounts "discriminates" among employees. Some employees lose something and others do not. However, the only way this tends to discourage union membership is that it

creates different interests among the employees such that they will be less willing to band together and to have one authority represent their collective interests.[5] Such will be the result of any action by an employer which causes employees to receive anything but absolutely equal benefits. A seniority system creates disparate interests among the employees, as does the existence of different pay scales for different jobs. Absent a finding that the company implemented the forfeiture, to which the union had agreed, for the purpose of discouraging employees from union membership, the Board could not properly conclude that the company's action violated the Act.

### Unilateral Increases

■ In 1969 the company granted increased insurance benefits to the unit employees without first notifying the union and without affording the union any opportunity for negotiation. Since insurance benefits are a mandatory subject of collective bargaining, the company's action was a clear violation of section 8(a)(5) of the Act. *See, e. g., NLRB v. Amoco Chemicals Corp.,* 529 F.2d 427 (5th Cir. 1976); *NLRB v. Citizens Hotel Co.,* 326 F.2d 501 (5th Cir. 1964).

■ In addition to increasing insurance benefits unilaterally in 1969, the company also raised wages by $.25 per hour without the union's assent. The company first notified the union of its desire immediately before a decertification election on August 1. After the union won the election, the parties met and the company asked the union to agree to this increase which the company said was necessary to halt the high turnover of employees. The union, which wanted to discuss a wide variety of changes in the collective bargaining agreement, would not agree. The next day the company informed the union that it was implementing the increase.

The ALJ found this to be a violation of the company's section 8(a)(5) duty to bargain. The Board affirmed summarily.

Winn-Dixie challenges this finding on the grounds that *NLRB v. Tex-Tan, Inc.,* 318 F.2d 472 (5th Cir. 1963), and *A. H. Belo Corp. (WFAA–TV) v. NLRB,* 411 F.2d 959 (5th Cir. 1969), *cert. denied,* 396 U.S. 1007, 90 S.Ct. 561, 24 L.Ed.2d 498 (1970), dictate a contrary result. We agree.

In *Tex-Tan* the Fifth Circuit refused to find a violation of the duty to bargain where the company met and conferred with the union before implementing an increase in wages. In *Belo* the court similarly refused to find a violation where the company had notified the union of its intention to implement changes and had given the union opportunity to present counterproposals.

It seems clear that Winn-Dixie has complied with its statutory duty to bargain. Before implementing the change, it gave the union notice of its desire to raise wages and met with the union in a bargaining session at which the union presented counterproposals.

■ After the 1971 contract had expired, the company notified the union that it was once again experiencing a high employee turnover and that it wished to increase wages by 5.5%. After a bargaining hiatus caused by a decertification election which the union eventually won, the company reasserted its desire to raise wages. The union and the company then met on several occasions to discuss the proposed increase.

As the year 1972 drew to a close, the company informed the union that it wanted to implement the increase as soon as possible for fear that the Cost of Living Council guidelines would prohibit the raise if it were not make quickly. The union, which again wanted to discuss numerous changes in the terms and conditions of employment, continued to resist implementation of the wage increase. On January 29, 1973, the company, without the union's assent, granted increases ranging from 4.11% to 6.23%.

The ALJ found that the increases granted by the company differed significantly

---

5. In some sense causing these employees to lose their accounts made the interests of the employees more uniform. Before the forfeiture, some employees had accounts and some did not; after the forfeiture, no employee had an account.

from the 5.5% increase the company had proposed to the union in their negotiating sessions. The ALJ found this to be a violation of section 8(a)(5) and (1) of the Act because it amounted to a unilateral increase in wages without giving notice to the union and without giving the union a meaningful opportunity to make counterproposals. The Board affirmed.

As discussed above, the law in the Fifth Circuit is that a company may unilaterally increase wages if it first notifies the union of its intentions and allows the union meaningful opportunity to negotiate. It seems clear to us that implementing changes significantly different from those proposed to and rejected by the collective bargaining representative is tantamount to implementing changes without notifying the union of the proposed changes. *Cf. NLRB v. Katz,* 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962) (unilateral grant of wage increase higher than that proposed to and rejected by union). We agree that, with respect to the changes actually implemented, the union had neither notice nor opportunity to respond.

### Surface Bargaining

The union complains of the Board's failure to find the company guilty of other unfair labor practices. Only one of these supposed violations merits discussion.

Among the initial charges it filed in this case the union, as charging party, alleged that the company had acted in overall bad faith in its dealings with the union. According to the union, Winn-Dixie had acted as though no collective bargaining representative of the employees existed. The regional director refused to include this charge in the complaint and, on appeal by the union, the general counsel affirmed the regional director's decision.

Despite the absence of a charge of overall bad faith, or "surface bargaining," the ALJ believed that this issue was properly before him and decided that the company was in fact guilty of engaging in surface bargaining. The Board reversed on the ground that the general counsel, who has control of the scope of the proceedings under section 3(d) of the Act, did not include this charge in the complaint or attempt to litigate the issue. According to the Board, the ALJ misunderstood the general counsel's position regarding the presence of the surface bargaining issue.

Section 3(d) of the Act leaves to the general counsel the decision as to what is and what is not at issue in an unfair labor practice hearing. The union does not contend that the ALJ has the power to allow the complaint to be amended without the consent of the general counsel, nor does it contend that the ALJ is free to find an unalleged violation based on evidence presented over the general counsel's objection. Rather, the union contends that the ALJ correctly understood the general counsel's position to be that the sum of the individual allegations in the complaint gave rise to a surface bargaining charge.

■ While the general counsel's position was a bit ambiguous, we believe that the Board was correct in deciding that he had not acquiesced in the expansion of the scope of the hearing. During the course of the proceeding, the general counsel objected to the introduction of all evidence not relevant to the specific allegations in the complaint. Although the general counsel advised the ALJ that he was free to find a surface bargaining violation if the evidence pertaining to the specific violations charged in the complaint was sufficient to make the surface bargaining issue "fully litigated," an accurate statement of the law in the Fifth Circuit, *see NLRB v. Sunnyland Packing Co.,* 557 F.2d 1157 (5th Cir. 1977), the ALJ, over the general counsel's objection, admitted evidence not relevant to the specific allegations. Since the ALJ apparently misconstrued the general counsel's statements and expanded the scope of the hearing without his consent, we conclude that the Board acted within its discretion in reversing the ALJ's finding.

### Remedies

■ Both the company and the union complain of the remedies fashioned by the

Board. The company contends that the Board has gone too far; the union contends that the Board has not gone far enough. We note at the outset that this court can refuse to enforce an order of the Board only if the Board's remedy is a patent attempt to achieve some goal other than those underlying the Act or the Board's remedy is unduly burdensome on the employer. *See Fibreboard Paper Products Corp. v. NLRB,* 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964).

We think that the company's objections to the monetary relief ordered by the Board are persuasive. To remedy the harm flowing from the company's violations with respect to the profitsharing/retirement plan, the Board ordered the company to reinstate the accounts of those employees who forfeited their interests as a result of the 1970 bargaining agreement, to establish accounts for those employees who would otherwise have become eligible for inclusion in the company plan, to make appropriate annual contributions to these accounts and to pay the employees the annual bonuses of up to $300 which they would otherwise have received.

■ Since we have refused to affirm the Board's finding that the forfeiture of the then-existing accounts resulted from violations of the Act, we naturally refuse to enforce the reinstatement aspect of the Board's remedy. Forfeiture of those accounts resulted from the union's acceptance of the New Orleans contract and not from any refusal to bargain on the part of Winn-Dixie.

■ Even though the company did violate its duty to bargain by refusing to discuss the possibility of coverage under both the union pension plan and the company's profitsharing/retirement plan, we are unable to enforce that part of the Board's order which requires the company to create accounts for those employees who would have become eligible since the 1970 bargaining agreement, to make annual contributions to those accounts, and to pay those employees the annual cash payment of up to $300 to which they would have been entitled. The Board justifies this remedy

as an effort to recreate the status quo ante existing before adoption of the 1970 contract. It obviously does not. The unit employees have been covered by the pension plan proposed by the union since 1970. The Board order creates a status novus which would exist only if the employees had succeeded in getting simultaneous coverage under both the union's pension plan and the company's profitsharing/retirement plan.

Although we share with the Board a concern that the employees cannot be made whole for any harm they may have suffered as a result of the company's refusal to bargain over "double coverage," we think that the Board's remedy here is too speculative and that it is unduly burdensome on the employer. Even though the company violated the Act, there is no way to evaluate, or even to identify, the harm flowing to the employees as a result of that violation. We therefore refuse to enforce all parts of the Board's order requiring the company to provide monetary relief for violations relating to its profitsharing/retirement plan.

The ALJ, who had found Winn-Dixie guilty of surface bargaining, ordered the company to remedy any harm the Jacksonville warehouse employees may have suffered as a result of Winn-Dixie's violations by paying those employees the difference if any, between the benefits received by the unit employees and the benefits received by employees at a comparable nonunionized Winn-Dixie warehouse. Although the Board reversed the ALJ's finding of surface bargaining, it affirmed the remedy in an effort to make whole the employees for any losses they may have suffered as a result of the company's unilateral increases in insurance benefits and wages and other unfair labor practices.

■ Of course, the Board cannot fashion remedies on the basis of an assumption as to what the parties would have agreed to absent an employer's failure to bargain in good faith. *H. K. Porter Co. v. NLRB,* 397 U.S. 99, 90 S.Ct. 821, 25 L.Ed.2d 146 (1970); *Ex-Cell-O Corp.,* 185 N.L.R.B. 107 (1970), *enf'd as modified sub nom., International*

*Union, U. A., A. & A. Imp. Wkrs. v. NLRB,* 145 U.S.App.D.C. 384, 449 F.2d 1046 (1971). But the Board's theory here is not that the union and the company would have agreed to terms identical to those in a comparable warehouse; rather, the Board assumes that had there been no union representation in the Jacksonville warehouse those employees would have received the same benefits as the employees in a comparable warehouse.

■ We are unable to enforce this effort of the Board to surmount the problem it recognized in *Ex-Cell-O.* The theory behind this remedy rests on two assumptions, both of which we believe to be unfounded. First, the Board assumes that the company had a policy of uniform benefits for all its employees, both in Jacksonville and elsewhere. We cannot find substantial evidence for this finding in the record. Company witnesses did testify that the company's insurance plan and profitsharing/retirement plan were companywide. But this hardly means that other benefits such as wages, vacation time, coffee breaks, etc. are uniform. One company witness stated the company tried to keep the cost of benefits on a "relatively even keel" for all employees. However, this one statement cannot amount to substantial evidence to support a finding that the benefits to the employees were uniform. We are especially reluctant to characterize this as substantial evidence since the existence *vel non* of uniform benefits was not at issue in the proceedings before the ALJ. The company had no notice that the ALJ would make a finding on this subject and thus had no opportunity to present evidence to the contrary.

■ The second assumption underlying the Board's theory is that any differences between benefits received by these unit employees and the employees at a comparable warehouse are due to the company's unfair labor practices. But if there are any differ-ences they may be due to other factors, e. g., the skill or lack thereof of the union negotiator, the presence or absence of competing employers in the vicinity of a "comparable" warehouse, the attitudes of the various warehouse managers toward employee compensation, etc.

Given the dubious nature of these two assumptions, we think the Board's remedy is simply too speculative and thus unduly burdensome. We are reinforced in this belief by contemplating the problems we envision in trying to compare the value to an employee of various forms of benefit. If, say, the employees at one warehouse have one more day of sick leave per year than those at the Jacksonville warehouse and the Jacksonville employees get $.05 more per hour, then what is the net difference in benefits?[6] The Board admits that these employees may not have been harmed at all as a result of Winn-Dixie's failure to bargain. We think that the Board's effort to measure the extent of those damages by comparison of benefits in a similar warehouse an inappropriate method of evaluating the extent of what may be a nonexistent harm.

■ The union contends that the remedies ordered by the Board are insufficient. Specifically, the union argues that the Board should have awarded it litigation and excess organization expenses.

The ALJ awarded litigation expenses to the union on the ground that the union had gone to great trouble and expense in its efforts to vindicate the section 7 rights of these employees. The Board, relying on its decision in *Tiidee Products, Inc.,* 194 N.L. R.B. 1234 (1972), reversed. In *Tiidee* the Board held that if a company's defenses to an unfair labor practice charge were debatable, an award of litigation expenses would be improper. In the instant case, the Board found Winn-Dixie's defenses debatable and accordingly refused to grant litigation expenses.

---

**6.** When the element of timing is added, the matter becomes even more perplexing. In comparing company benefits over the eight years since the company's first violation involved in this case, one might well run into the problem of evaluating the difference between receiving a $.05 per hour increase on June 2, 1972, and having an extra five minutes added onto the morning coffee break as of February 9, 1975.

In *NLRB v. Food Store Employees Local 347 [Heck's],* 417 U.S. 1, 94 S.Ct. 2074, 40 L.Ed.2d 612 (1974), the Supreme Court specifically approved the Board's debatable-frivolous standard. In *Heck's* the court of appeals had awarded the union litigation expenses even though the Board had refused to do so. Although the employer had a long history of labor violations, the Supreme Court reversed the court of appeals and held that the decision not to award litigation expenses when an employer asserts debatable defenses was within the Board's discretion:

> We cannot say that the Board, in performing its appointed function of balancing conflicting interests, could not reasonably decide that where "debatable" defenses are asserted, the public and private interests in affording the employer a determination of his "debatable" defenses, unfettered by the prospect of bearing his adversary's litigation costs, outweigh the public interest in uncrowded dockets.

417 U.S. at 8–9, 94 S.Ct. at 2079. We find *Heck's* controlling. The Board's denial of litigation expenses was well within its discretion.

▪ The union's claim for excess organization expenses can be dealt with just as summarily. The ALJ found that the only organizational activities of the union during the relevant time period took place in connection with the decertification election in 1969. He also found that the union had not established the requisite "nexus" between any excess organization costs and Winn-Dixie's unlawful conduct. The Board will not grant excess organization expenses unless such a "nexus" exists. *See Tiidee Products, supra.* The ALJ and the Board correctly found that the necessary connection was lacking in this case.

All other aspects of the Board's order are enforced.

ENFORCEMENT ORDERED IN PART AND DENIED IN PART.