**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**ALLIS–CHALMERS CORPORATION, Respondent.**

Nos. 78–1742, 78–3322.

United States Court of Appeals, Fifth Circuit.

Aug. 30, 1979.

John Elligers, Supervisor, Washington, D. C., for N.L.R.B. in 78-3322.

Charles M. Paschal, Jr., Director, Region 15, N.L.R.B., New Orleans, La., for other interested party.

Before THORNBERRY, GOLDBERG and GEE, Circuit Judges.

THORNBERRY, Circuit Judge:

After three successive elections,[1] the United Auto Workers (UAW) finally won a majority in a representational election in the Allis-Chalmers Corporation plant in Jackson, Mississippi. Allis-Chalmers filed a number of objections to the election with the National Labor Relations Board. The Regional Director for the Board rejected these contentions and certified the UAW; the Board adopted the Regional Director's decision. In separate proceedings, the Board subsequently found Allis-Chalmers had committed several unfair labor practices in failing to bargain with UAW. On consolidated applications for enforcement of separate orders of the Board, we enforce in part and remand in part.

I. UAW Certification.

The issue common to both applications is whether the Board correctly certified the results of the election, recognizing the UAW as the collective bargaining representative. If the Board were incorrect in this determination, then Allis-Chalmers could not be liable for the subsequent refusals to bargain. In reviewing this decision, the appropriate standard of review is whether the decision is reasonable and is supported by substantial evidence; Allis-

Elliott Moore, Deputy Associate, Gen., Counsel, N.L.R.B., Joseph Oretel, Atty., Washington, D. C., for petitioner in both cases.

Jolly, Miller & Milam, E. Grady Jolly, James R. Lockard, Jackson, Miss., for respondent in both cases.

Lynn Agee, Memphis, Tenn., for intervenor Int'l Union, United Automobile, Aerospace & Agricultural Implement Workers of America.

1. In the first election, held on April 25, 1974, the UAW, the International Union of Electrical, Radio and Machine Workers, and the International Brotherhood of Electrical Workers vied to represent production and maintenance workers at the Jackson plant. When no union received a majority of votes, a runoff election was held on May 16, 1974, in which a majority was cast against the UAW, the only labor organization on the ballot. After the Board overturned this election on the basis of employer misconduct, the election at issue in this case took place on March 21, 1975.

Chalmers carries the burden of proving that the election should be set aside. *Contract Knitter, Inc. v. NLRB*, 545 F.2d 967 (5 Cir. 1977).

In attacking the certification, Allis-Chalmers points to three items of information disseminated by the UAW that it claims infected the pre-election process. We will deal with them *seriatim*.

A. UAW Handbill—Five weeks prior to the election the union circulated a handbill which stated that the Board had "recommended that Randy Cook [a fired employee] be put back to work with full pay." This was a misstatement of fact; the Regional Director had issued a complaint against Allis-Chalmers, but the Board otherwise had not acted on the Cook discharge.

The Board asserts that this misrepresentation did not vitiate the election because the company and the union had corrected the impression imparted by the handbill. Allis-Chalmers argues that this conclusion is in conflict with *Formco, Inc.*, 96 LRRM 1393 (1977). In *Formco* the Board, faced with a similar fact situation, determined that misstatements concerning Board functions required a new election. The Board rejected as irrelevant the argument that the employer had the opportunity to respond and had failed to do so.

It could perhaps be argued that the Employer had ample time to respond. Petitioner's misstatement here occurred on March 11, 1977, and the election was held some 7 weeks later, on April 29, 1977. However, we find the fact that there may have been time to respond is not a valid consideration with respect to the conduct here involved. The Petition-

er's misstatements were reasonably calculated to mislead employees into believing that the Board had judged the Employer to have committed unfair labor practices whereas, in truth, such practices were never proven. The impact of the Petitioner's message upon the freedom of choice of the voter is not amenable to credible or effective response by the Employer. Employees may well view any response by the Employer as an attempt to extricate itself from the damaging effects of an adverse finding by the Board by seeking to mislead them.

*Id.* at 1394. In light of this apparent conflict between the Board's reasoning in the present case and the *Formco* language, Allis-Chalmers urges that we remand to the Board for an explanation of the inconsistency.

We believe, however, that the present decision can be reconciled with *Formco*, obviating the necessity of remand. Under *Hollywood Ceramics*, 51 LRRM 1600 (1962),[2] the Board applies four criteria in determining if a misrepresentation vitiates an election.[3] The third criterion requires an inquiry whether the opposing party had an adequate opportunity to reply and to correct the misrepresentation. The quoted language from *Formco* appears to us to merely repudiate the relevance of this speculative inquiry in determining the likelihood that a misstatement had a significant effect on an election. Under *Formco*, in light of the problematic effect of disclaimers by an opposing party, that party would not be penalized for failing to respond. In the present case, however, the Board determined that clarifications actually given by

---

**2.** After certification in this case, the Board overruled *Hollywood Ceramics* in Shopping Kart Food Market, 94 LRRM 1705 (1977). However, the Board has subsequently returned to the *Hollywood Ceramics* standard in General Knit of California, 99 LRRM 1687 (1978).

**3.** The rule for determining whether a misrepresentation can reasonably be expected to have had a significant effect on an election requires evaluation of four factors:

    (1) whether there has been a misrepresentation of a material fact;

    (2) whether the misrepresentation came from a party in an authoritative position to know the truth, or who had special knowledge of the facts;

    (3) whether the other party in the election had adequate opportunity to reply and to correct the misrepresentation;

    (4) whether the employees had independent knowledge of the misrepresented fact so that they could effectively evaluate the propaganda.

*Hollywood Ceramics, Inc.*, 51 LRRM 1600 (1962).

the employer *and* the union were sufficient to dispel the insidious effects of the original misstatement. We do not believe that *Formco* forecloses this type of factual inquiry into the actual effect of misstatements upon an election. The premise of Allis-Chalmers' assertion, as clarified at oral argument, appears to be that *Formco* announced a *per se* rule mandating a new election whenever the Board is implicated by a misstatement. Although this may be appropriate as a matter of policy, we do not perceive that *Formco* announced this draconian remedy.

B. Gadsen Check Stubs—Three days before the election UAW mailed to Jackson employees copies of check stubs from the Gadsen, Alabama plant of Allis-Chalmers, which the union had previously organized. Copies were also distributed by hand two days before the election. The wages on the stubs did not reflect only base hourly wages, but were calculated in part upon incentive compensation. No indications of this additional factor were noted on the stubs.

The Regional Director, applying the *Hollywood Ceramics* test, *see* note 3, *supra*, determined that the union did not have special knowledge of the Gadsen pay schedules, that Allis-Chalmers had the opportunity to explain the stubs, and that the employees were in a position to know the truth. After review of the evidence summarized in the Regional Director's decision, it appears that this determination is based upon substantial evidence. The evidence reflects that during a previous election at the Jackson plant in 1974 the union had attempted a similar ploy, but had been stymied by the actions of competing unions in informing the employees of the discrepancies between the stubs and the base hourly wages. Moreover, prior to the present election, representatives of Allis-Chalmers had warned employees that the union might attempt the same trick, and after the Gadsen stubs were distributed, Allis-Chalmers vigorously warned employees of the possibility of discrepancies. Finally, the evidence reflects that UAW representatives alluded to discrepancies when questioned by employees at meetings.

C. Master Contract—Allis-Chalmers charged that the union represented to employees that there was a master contract covering all Allis-Chalmers plants and that this representation led employees to believe that the union necessarily could secure benefits equivalent to those in northern plants. There is, in fact, no master contract as such.[4] The Regional Director assumed *arguendo* that the union had misrepresented the existence of a master contract, but found that the union and Allis-Chalmers had effectively dissipated any misrepresentation in advising employees that no benefits were assured and that everything was subject to bargaining. Allis-Chalmers, however, argues that

The Regional Director's finding in this regard fails to take into account the differentiation which must be made between what an employee could reasonably believe would be the result of bargaining on a multi-plant basis for a *single* contract governing the wages, hours and working conditions of all Union represented employees of the Respondent's plants and the result of merely bargaining for a contract covering the wages, hours and working conditions of the Jackson facility's employees.

Respondent's Brief at 27. We do not believe it reasonable to assume, however, that, in light of the few references to a master contract and the constant iteration by Allis-Chalmers and the union that benefits and wages at the Jackson plant would have to be negotiated, the employees would presume that voting for the union would necessarily secure for them the enticing benefits of their northern compatriots. Furthermore, the record reveals that the existence and applicability of a general contract were discussed at employee meetings, reflecting a dialogue that enabled the voters to effectively evaluate the proposition.

4. There is, however, a Central Bargaining Committee in which Allis-Chalmers' management and representatives of unionized plants discuss certain issues.

■ Although we cannot condone these union misstatements, we do not think that the effects of these particular instances were such as to vitiate the election. It is axiomatic that the good sense of the voters must be relied upon in the first instance to effectively evaluate electioneering hyperbole. This principle is especially compelling in the present case since, because of the recurrent representational elections at the Jackson plant, the particular electorate assumedly was more sophisticated, and certainly more experienced, than most. With reference to this premise and our general deference to the Board in certification matters, our evaluation of the evidence leads us to the conclusion that the Board properly certified the union.

## II. Unfair labor practices in No. 78–1742.

The Board seeks enforcement of orders finding that Allis-Chalmers had violated § 8(a)(1) and § 8(a)(5)[5] in refusing to bargain concerning certain changes in working conditions. Allis-Chalmers objects to these determinations and to the remedy provided. We enforce in part and remand in part.

A. Discharges in SDO Department— Pending Board certification of the union, Allis-Chalmers discharged forty-four employees in the SDO Department[6] without notifying the union or offering to bargain. After the Board charged violations of § 8(a)(1) and § 8(a)(5), an administrative law judge held a hearing and determined that although the discharges had been compelled by economic necessity, and therefore, the failure to bargain concerning them was not an unfair labor practice, the refusal to bargain concerning the effects of the discharges—i. e., severance pay, vacation pay, insurance, pensions, and seniority—violated the Act.

5. Section 8, 29 U.S.C. § 158, provides in pertinent part:
   (a) It shall be an unfair labor practice for an employer—
   (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

■ As a general rule, an employer that refuses to bargain on the ground that an election is invalid does so at its peril; if the election challenge were to prove fruitless, an order by the Board based on the refusal to bargain would be enforced. *See NLRB v. W. R. Grace & Co.*, 571 F.2d 279 (5 Cir. 1978). Allis-Chalmers, admitting the general applicability of the at-peril rule, urges an exception recognized in *Sundstrand Heat Transfer, Inc. v. NLRB*, 538 F.2d 1257 (7 Cir. 1976). In that case the Seventh Circuit determined that the at-peril doctrine would not apply to the failure to bargain concerning the effects of discharges compelled by economic necessity. In the Fifth Circuit, however, this question is controlled by *NLRB v. W. R. Grace & Co., supra*, in which the court stated:

> It is irrelevant that the company's action was based on compelling economic considerations. An employer is not required to forego needed changes, but he must first notify the union in order that the voices of those affected by the changes are heard. The union was given no notice of the changes in the instant case and thus had no opportunity to offer input into the decisional process. The failure to notify or refusal to bargain with the union over the effects of management decisions to limit production or otherwise alter operations violates Section 8(a)(5) and (1) of the Act.

571 F.2d at 283.

Additionally, Allis-Chalmers argues that it had no obligation to bargain concerning rehiring of terminated employees since, in denying preferential treatment to the discharged employees on consideration for rehiring, it was following long-established company policy. Effectuating this policy, therefore, was not a "change" subject to bargaining under *W. R. Grace.*

   (5) to refuse to bargain collectively with the representative of his employees, subject to the provisions of section 159(a) of this title.

6. The SDO Department produces circuit breakers employed by electric utility companies. *See* Respondent's Brief at 30.

However, if, as a general rule, the effects of discharges were proper subjects for bargaining, then the fact that the effects were entirely consistent with pre-existing policies should not in any way alter the obligation to bargain. The complete termination of the employment relationship is much more than merely the maintenance of the status quo, and the concomitant effects of the termination should be subject to bargaining. Otherwise, the obligation to bargain recognized under *W. R. Grace* would be effectively vitiated in an indeterminate number of cases.

B. Backpay Awards—The ALJ ordered that backpay be awarded to the terminated employees, because although the discharges were economically justified, if Allis-Chalmers had bargained, some of the terminations might have been avoided "by resort to transfer and other alternatives." However, no factual basis was adduced for this conclusion. In *NLRB v. Amoco Chemicals Corp.*, 529 F.2d 427 (5 Cir. 1976), this court, facing a similar situation, remanded to the Board for a more complete evidentiary determination. The opinion stated in pertinent part:

> The Board suggests that had bargaining not been pre-empted by the employer's unilateral action, the Union could have agreed to "layoffs or transfers to other operations of the parent corporation, or to implement some other proposal" and states that the innocent employees should not be made to suffer from speculation of what might have happened. It is clear that the Company had a duty to bargain concerning the effects of the phase out of operations at the terminal. *See NLRB v. Winn-Dixie Stores, Inc.*, 361 F.2d 512 (5th Cir.), *cert. denied*, 385 U.S. 935, 87 S.Ct. 295, 17 L.Ed.2d 215 (1966). Negotiations could have produced several possible solutions. Under one, the Union could have insisted that the available work be spread out less evenly, preferring to have senior drivers

benefit at the expense of the newer employees. Another equally plausible negotiation could produce the very across-the-board reduction which actually resulted. However, for this court to engage in any such "reconstruction" of events to approve what the Board may order is to compound speculation. Without a more complete factual foundation than this record now offers, the Board may not infer a loss and thereby justify its decision to award back pay.

The Board seeks to distinguish *Amoco Chemicals* on the grounds that in this case, the employees suffered a definite financial loss because Allis-Chalmers refused to bargain concerning rehiring preference when the SDO Department was re-opened. There is no factual basis for inferring, however, that bargaining necessarily would have resulted in the rehiring of the terminated employees. Following the reasoning of *Amoco Chemicals*, therefore, we remand to the Board.[7]

C. Unilateral Increases in Wages and Benefits—On June 23, 1975, and February 2, 1976, Allis-Chalmers respectively granted a thirty cents per hour increase in wages and an improvement in workmen's compensation benefits, and a twenty-three cents per hour wage increase and a new sick leave program. Allis-Chalmers contends that the increases were in compliance with a periodic survey of wages and benefits and were, therefore, not subject to bargaining. *See NLRB v. Katz*, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962); *NLRB v. J. P. Stevens & Co.*, 538 F.2d 1152 (5 Cir. 1976). The employer carries a heavy burden of proving that such adjustments of wages and benefits are purely automatic and pursuant to definite guidelines. The record reflects, however, that the increases were not automatic, in that Allis-Chalmers exercised considerable discretion in determining the timing and amount. Therefore,

---

7. The remedy as articulated by ALJ appeared to require the award of backpay as a means of ensuring good faith bargaining by Allis-Chalmers. However, at oral argument, the Board apparently abandoned this contention, and characterized the awards as a purely make-whole or compensatory remedy.

the union could properly demand bargaining. *See NLRB v. Katz, supra.*[8]

III. Unfair labor practice in No. 78–3322.

In January 1978, Allis-Chalmers granted an 8% wage increase without bargaining with the union. The Board found this to be a § 8(a)(5) violation. As in Part II(C), *supra*, Allis-Chalmers seeks to justify this action as merely an attempt to maintain the status quo by continuing the policy of periodic wage increases. For the same reasons as adduced in II(C), this argument fails.

ENFORCED in part, REMANDED in part.

GEE, Circuit Judge, specially concurring:

I concur in most of the majority opinion and in its result.

Unlike the majority, however, I find myself unable to reconcile the quoted language from *Formco* with the Board's reasoning and result in this case. It was my belief that in *Formco* the Board issued a clear warning not to trifle with its processes by misstatements about them in representation election campaigns, a belief reinforced by its language immediately following that quoted in the main opinion:

> As we stated in *Thiokol Chemical Corporation,* supra, a case in which an employer had reprinted an outdated Board document, "A Layman's Guide to Basic Law Under the National Labor Relations Act" (1962 edition), to misstate the presently existing law as to the rights of economic strikers:

> "We think the [dissenter's] reliance on the Union's 'opportunity to correct' the misrepresentation is misplaced. It is questionable whether any partisan in a campaign can credibly and effectively correct a misstatement, buttressed by official documents, about the legal principles applies by the public agency administering the statute. In any event, we deem it more salutary not to attempt any such evaluation."

> Our concern is with the protection of the integrity of our own processes, lest any voter be left with the impression that this Board is biased in favor of any party in an election. We are unwilling to condone any campaign statement which even implies such bias. Accordingly, Objection 1 is hereby sustained, and we shall set the election aside and direct that a new one be conducted.

Formco, Inc., 96 L.R.R.M. 1393, 1394 (1977).

In view of my understanding of *Formco*, I find the Board's action in this matter enigmatic. Instead of either acknowledging or overruling *Formco*, the Board simply ignores it. This it has power to do, however, no matter how confusing such behavior may be. Nor am I able to conclude its order is not supported by substantial evidence. I therefore concur.

---

**8.** Allis-Chambers also complains of a Board finding that the failure to bargain concerning the re-imposition of lapsed work rules by Supervisor Jerry Pilgrim was an unfair labor practice. The company posits three arguments for reversing this determination. First, it argues that no evidence was presented that a member of management was aware of Pilgrim's action. However, Allis-Chalmers cannot disclaim the actions of a supervisor of a department, especially when it does not contend that Pilgrim did not have the authority to act as he did. Second, the company argues that the rules were matters of managerial preogative, not subject to bargaining. This contention is effectively belied by the holding in *NLRB v. Amoco Chemicals Corp.*, 529 F.2d 427 (5 Cir. 1976). Third, Allis-Chalmers argues that Pilgrim's action was, at most, a technical violation of § 8(a)(5), which "does not warrant the application of legal formulas and a remedy." Respondent's Brief at 47. Although unspoken, the company may be invoking the argument that a *de minimis* failure to bargain may not be a violation of § 8(a)(5). *See NLRB v. Little Rock Downtowner, Inc.*, 414 F.2d 1084 (8 Cir. 1969). However, Allis-Chalmers does not elaborate on why this violation should be considered *de minimis.* Moreover, in light of the fact that Pilgrim supervises approximately forty of the three hundred covered employees, it is hard to perceive the *de minimis* character of his actions.